**UNITED STATES of America, Appellee,**

v.

**David K. BUCKLEY, Defendant, Appellant.**

**David K. BUCKLEY, Petitioner, Appellant,**

v.

**UNITED STATES of America, Respondent, Appellee.**

**Nos. 85–1500, 86–1755 and 87–2126.**

United States Court of Appeals, First Circuit.

Heard Jan. 4, 1988.

Decided May 31, 1988.

Martha R. Reeves, by Appointment of the Court, for appellant David K. Buckley in Nos. 85–1500 and 86–1755.

David K. Buckley, pro se in No. 87–2126.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Portland, Me., and William H. Browder, Jr., Asst. U.S. Atty., Bangor, Me., were on brief, for appellee.

Before CAMPBELL, Chief Judge, and BREYER and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Appellant David Buckley was indicted by a grand jury for violations of federal drug laws. He pleaded guilty to one of the two charges against him, and was sentenced to five years in jail. Seven months later, Buckley sought to withdraw his guilty plea on the ground that he had been mentally incompetent when he tendered it. The district court denied this motion, a decision from which Buckley now appeals. He also complains of certain irregularities in the procedures attending his sentencing.[1]

## I. THE GUILTY PLEA

### A. Background

Buckley and three others were indicted in May 1984 for their alleged involvement

---

1. While these two direct appeals—which themselves were consolidated under Fed.R.App.P. 3(b)—were pending, Buckley filed in the district court a section 2255 motion to vacate, set aside, or correct his sentence. 28 U.S.C. § 2255 (1982). We have held that in the absence of extraordinary circumstances (not present here) a district court should not entertain a section 2255 motion while a direct appeal from the same conviction is still pending, *see United States v. Gordon,* 634 F.2d 638 (1st Cir.1980). Nonetheless, the district court here denied Buckley's motion. *United States v. Buckley,* 670 F.Supp. 1056 (D.Me.1987). We have allowed Buckley's motion to consolidate his direct appeals and his section 2255 appeal. We discuss the latter at note 6, *infra.*

in a drug smuggling operation along the Maine coast. Count I of the indictment charged the four with conspiracy to possess marijuana with the intent to distribute it, in violation of 21 U.S.C. §§ 846, 841(a)(1) (1982); Count II charged them with the underlying offense, possession of marijuana with intent to distribute, 21 U.S.C. § 841(a)(1) (1982). After the indictment was returned, Buckley, his attorney (Keefe), and the government prosecutor (Browder) entered into a written plea agreement, under which Buckley promised to plead guilty to the conspiracy charge (Count I) in exchange for the government's promise to dismiss the possession charge (Count II) against him and not to seek an indictment of Buckley's younger brother, John Buckley, for whatever involvement he may have had in the alleged drug operation.

The parties agreed that Buckley would be arraigned and would enter his guilty plea on June 15, 1984. But due either to a conflict in Keefe's schedule or to Buckley's firing Keefe, Buckley appeared before the court pro se on June 15, 1984. The district court engaged Buckley in a plea colloquy as required by Fed.R.Crim.P. 11, advising him several times to retain—or have the court appoint—a lawyer. During the colloquy Buckley said, inter alia, 1) that he was "emotionally disturbed," 2) that he was innocent of the charged offenses, 3) that the government had violated his rights by presenting illegally obtained evidence to

the grand jury, and 4) that he wished to plead guilty even though he was innocent in order to protect his brother. Based on these and other statements by Buckley, and on the general discursiveness of his responses to the court's questions, the court rejected Buckley's guilty plea, and directed the clerk to enter a plea of not guilty. The case was continued without prejudice to Buckley's right to plead guilty later.

Two weeks later, on June 29, 1984, Buckley, accompanied by Keefe, appeared before the court and offered again to plead guilty under the terms of the aforementioned written plea agreement. It was the explicit understanding of the court and the parties that Buckley's plea was an *Alford* plea (*North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)), that is, Buckley, without explicitly admitting his guilt, would plead guilty in order to receive the benefits of the plea agreement. The court again engaged Buckley in a plea colloquy in order to ensure that his plea was knowing and voluntary. Fed.R. Crim.P. 11(c) & (d).[2] During the colloquy, Buckley told the court that, although he was "rational now," he suffered from a "manic depressive psychosis," which periodically caused episodes of erratic behavior and mood swings. Buckley also told the court he thought the government's prosecution of him was unconstitutional, for some of the evidence presented to the

---

**2.** These two subsections provide a formal mechanism for ensuring that guilty pleas are knowing and intelligent. They provide as follows:

(c) **Advice to Defendant.** Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:

(1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole term and, when applicable, that the court may also order the defendant to make restitution to any victim of the offense; and

. . . .

(3) that the defendant has the right to plead not guilty or to persist in that plea if it has already been made, the right to be tried by a

jury and at that trial the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, and the right against compelled self-incrimination; and

(4) that if a plea of guilty or nolo contendere is accepted by the court there will not be a further trial of any kind, so that by pleading guilty or nolo contendere the defendant waives the right to go to a trial. . . .

(d) **Insuring That the Plea is Voluntary.** The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney for the government and the defendant or the defendant's attorney.

grand jury had been suppressed (in a separate state proceeding) by a Maine court as being the product of an illegal search.

The court accepted Buckley's guilty plea. As both the substance and flavor of this colloquy are of legal significance, we summarize and reproduce portions of the exchange:

1. The court asked Buckley to explain in some detail why he was pleading guilty. Buckley responded as follows:

> Your Honor, I have several reasons for pleading guilty to this indictment. I have some experience with the questions before the Court and I understand that I could plead guilty. I could plead innocent or I could plead innocent by reason of insanity, I suppose. I think at the time the action was committed I was in a state of mind that I don't recognize the state of mind which I recognize as a rational state of mind [sic]. I think people should be responsible for their irrational behavior when they are rational and I feel that I am rational now. In 1979 [the time of the alleged offense] I think evidence that the prosecutor has in his hands, and other evidence, probably will be able to permit the court in understanding that my mental status was not as clear as it is today. I am not using that as a defense for the following reason. I have practiced forensic psychiatry before Federal Courts and Judicial Courts in the State of Florida and have on more than 150 occasions rendered opinions of this type to other officers of the Court, and I feel that the mentally ill can be mental patients that come before Courts and end up with indeterminate sentences as a result of pleading insanity [and] are not that much better off than if they stood up and just pled guilty. I could plead innocent, but innocent of what would be a question in my own mind. I don't think I am completely innocent and I don't think I am completely crazy, and I don't think a plea of innocent would serve the circumstances of justice today because of the conditions of the plea agreement which include some compromises by Mr. Browder which I appreciate. In particular, the opportunity for my brother, who is now a first-year law student, not to be indicted.

> . . . .

> [B]y pleading guilty it's an intelligent and voluntary way and the damage done to myself and my family is less significant in terms of what has already become in my mind a difficult situation to understand and a confusing one to appreciate from both a psychological and a judicial position.

2. In response to the court's inquiry into Buckley's understanding of the benefit he would derive from pleading guilty, Buckley said,

> Your Honor, Mr. Browder is about 10 feet behind me and he has just five minutes to recall the Grand Jury and indict my brother and so if I step backwards from my position, I have no doubt that Mr. Browder's breath will be breathing down my neck with an indictment that I don't want to see.

> The other advantages are that Mr. Browder in his infinite kindness has dropped one count which will keep me out of prison for five more years and that's not an insignificant situation to look at, and also I have an interest in my own family, my son—my three year old son—who would like to see more of me, and if I fight this, not only would it be an ordeal financially, but it would potentially expose me to another manic depressive episode for which I recognize I don't have the psychological stamina to continue to prevent if I get enraged by a situation. Your Honor, there's no ifs, ands, or buts about it, I am an angry man, so rather than being that angry, I would rather just be guilty.

3. The court confirmed that Buckley had conferred with Keefe about his decision to plead guilty, and that Keefe agreed that the plea was in Buckley's interests and was made knowingly and voluntarily.

4. In response to the court's questions, Buckley said that he understood the elements of the offenses with which he was charged, and that he had discussed the charges with Keefe. Buckley told the

court that he understood the court's explanation of the penalties for these offenses. Buckley also told the court he was satisfied with his attorney's advice and representation with respect to the explanation of these offenses.

5. The court asked Buckley in successive questions whether he understood the following rights of a criminal defendant, rights he would waive by pleading guilty: a) the right to continue to plead not guilty, b) the right to a jury trial on the offense charged in Count I of the indictment, c) the assistance of counsel at such a trial, d) the right to court-appointed counsel if he were indigent, e) the right to cross-examine the government's witnesses, f) the right to present his own evidence, g) the right not to testify himself, and h) the right to appeal from a conviction. Buckley replied in the affirmative to each of the court's questions, and indicated that he understood that he waived these rights if he pleaded guilty.

6. In this same series of questions, the court asked Buckley whether he understood that if a trial took place he would be presumed to be innocent. Buckley replied,

A. I have a hard time understanding that, your Honor.

Q. [The Court:] Well, I think that's very frank of you to say that. There's a good many people who have difficulty with that, but let me explain to you what I mean. Do you understand that for purposes of that trial so far as the law was concerned, that the jury would be instructed that you were to be presumed to be innocent until, in the course of their final deliberations on the case, the jury was satisfied that the evidence produced by the government proved beyond a reasonable doubt that you were in fact guilty of the offense charged by Count I of this indictment?

A. Yes, sir, I understand that.

Q. And do you understand that in all respects in which the Court might act in such a trial, the Court would act upon the presumption that you were in fact innocent until the jury verdict had been returned?

A. Yes, sir.

Q. And that is what I meant when I asked if you understood if at such a trial you would be presumed to be innocent, and I take it that we now have a meeting of the minds on that?

A. Yes, sir.

Q. Do you understand that the government would be required at such a trial to prove you guilty by competent evidence and beyond a reasonable doubt before you could be found guilty of the charge set out in Count I of this indictment?

A. Yes, sir.

Q. And do you understand that you would not have to come into Court and prove that you were innocent of that charge at such a trial?

A. Who would do it for me?

Q. Well, the burden would be upon the government to prove you guilty, and I am asking you, sir, do you understand you would have no burden to prove that you were innocent. The burden of proof would always be on the government to prove beyond a reasonable doubt that you were guilty and that they would have to satisfy the jury by competent evidence of that?

A. If I were to argue the case on the grounds that I was not guilty by reason of insanity, would they have to prove that I was not insane?

Q. Well, the point of the matter is that you could argue or attempt to prove anything you wished to in the course of trial. What I am asking you is whether or not you understand that the central issue in that trial would be whether or not the government had carried its burden of proof, that is, that the government had satisfied the jury by the evidence which the government produced that you were guilty beyond a reasonable doubt?

A. Which would include not just the facts of the case but also the state of mind in which I was in at the time of the commission of the crime, right?

Q. Yes. The jury would have to be satisfied on the evidence produced at trial that the government had established beyond a reasonable doubt that you were guilty of the offense charged and you

could argue or attempt to prove anything you wished to prove with respect to your innocence, but whether or not you did attempt to prove that, the government could not obtain a conviction unless the jury was satisfied that the government had carried its burden of proof in the first instance.

A. Which would include the burden to prove that I was not psychotic if I claimed that I was psychotic, correct?

Q. Yes, that is correct.[3]

A. Okay. Yes, sir, I understand that.

7. The court told Buckley several times that any evidence discovered after the guilty plea was entered would be relevant only to his sentencing, and that Buckley would not be able to change his guilty plea. Buckley said he understood this.

8. The prosecutor explained to the court the evidence he would present to prove the charges against Buckley if the case were to proceed to trial. Keefe, Buckley's lawyer, stated that the admissible portion of this evidence would establish Buckley's guilt beyond a reasonable doubt, and that he had advised Buckley that this was so.

9. Keefe said he was familiar with the factual basis for a possible charge against Buckley's brother, and that the possibility of the conviction of Buckley's brother was sufficient to warrant Buckley's concern.

10. The following exchange occurred when the court attempted to ascertain whether Buckley felt he had been coerced to plead guilty:

Q. [The Court:] Dr. Buckley, has anyone threatened you or otherwise attempted to force you to tender this plea?

A. Besides Mr. Browder, your Honor, and his arrangements with my plea bar-

gaining, there's been no threats or anything.

Q. Well, Mr. Browder has not threatened you in the sense that I am using the term, has he?

A. Your Honor, I am not a student of free will and determinism but it comes very close to this situation.

Q. I am certain I am. Let me take some time to elucidate if I can. You understand that the United States Attorney, Assistant United States Attorney Browder, was simply giving you the option of either tendering this plea or being tried with all the consequences that he explained to you would be attached to that, is that correct?

A. I understand that, yes, your Honor.

Q. And you understand that so far as he is concerned and so far as this Court is concerned that is a decision that is entirely up to you, do you not?

A. I understand that, your Honor.

Q. And you understand that for purposes of the law, if you freely and voluntarily make that decision, there is no threat involved in that, do you understand that? You may not agree with it, but I'm asking you if you understand it?

A. I'm understanding it all too well.

Q. So now I ask you with that elucidation from the Court, has anyone threatened or has anyone attempted to force you in the manner in which I have described to plead guilty to this offense?

A. With the exception of that one totalitarian technique, absolutely not, your Honor.

Q. Well, now, Dr. Buckley, at some point we have got to bite the bullet on this.

---

**3.** Buckley's description of the burden of proof was not wholly accurate. Under the law in existence at the time of this colloquy, the prosecution had to prove a defendant's sanity beyond a reasonable doubt only after the defendant had introduced evidence sufficient to dispel the presumption of sanity. *See United States v. Dube,* 520 F.2d 250, 251 (1st Cir.1975), *cited in United States v. Pasarell,* 727 F.2d 13, 14 (1st Cir.1984). It is not clear that a defendant who merely "claimed [he] was psychotic" would disturb this presumption.

The district court's assent to Buckley's description of the law is inconsequential, however. Whether or not Buckley understood the nuances of the law, his misunderstanding only made proceeding to trial under an insanity defense a more attractive option than it really was.

In 1984 Congress enacted a statute that dramatically altered the law in this area, placing the burden on federal defendants to prove insanity by clear and convincing evidence. 18 U.S.C. § 17 (Supp. IV 1986). That statute does not apply here.

A. All right, your Honor, nobody has threatened me.

At the conclusion of the plea colloquy, the court stated that Buckley was "voluntarily, intelligently, understandingly and knowingly tendering this plea of guilty to Count I of this indictment." The court accepted the plea and continued the case for preparation of a presentence investigation report.

Seven months later, on February 1, 1985, Buckley and Keefe appeared before the court for the sentencing hearing. Keefe immediately announced to the court that Buckley, just an hour earlier, had informed him that he wished to withdraw his guilty plea. According to Keefe, Buckley viewed the guilty plea he had tendered at the June 29, 1984, hearing as "involuntary" because he had upon that occasion been under the influence of medication that made him "unable to rationally think about his guilty plea." Keefe added that Buckley felt he never had the requisite mens rea for the charged offenses, and should be allowed to withdraw his plea for that reason. Buckley himself addressed the court, making essentially these same arguments. According to Buckley, his recent conclusion that his guilty plea had been involuntary was only possible because he had been "drug-free" for the past seven months, and because he had read the reports of two doctors who examined him for sentencing purposes. The district court denied Buckley's motion. After giving both Buckley and Keefe an opportunity to address the court, the court imposed a provisional five-year sentence and committed Buckley for presentence observation pursuant to 18 U.S.C. § 4205(d) (1982).

B. The Law

A defendant has no absolute right to withdraw a guilty plea. But where a plea withdrawal motion is made prior to sentencing, the district court must determine whether, in the particular case, the defendant has advanced a "fair and just" reason for withdrawing his plea. Fed.R. Crim.P. 32(d); *United States v. Daniels*, 821 F.2d 76, 78–79 (1st Cir.1987).

Although on appeal Buckley makes several different arguments why he should have been allowed to withdraw his plea, the only ground for withdrawal that warrants consideration [4] is that his plea was involuntary due to his lack of mental competence when the plea was made. The court rejected this contention essentially because Buckley failed to furnish any reason causing the court to doubt its conclusion at the time of the Rule 11 colloquy that Buckley's plea was knowing and intelligent. In denying Buckley's motion to withdraw his plea, the court relied mainly on its own recollection of the plea colloquy; the court also noted the failure of the two medical reports upon which Buckley apparently relied in developing this theory, to support Buckley's theory.[5]

The question before us on appeal is whether this decision of the district court was an abuse of discretion. *Daniels*, 821 F.2d at 78. In making this determination we must examine both the plea colloquy itself and the "new evidence" Buckley presented in his withdrawal motion.

We have carefully reviewed the 41–page transcription of the Rule 11 colloquy, and find ample evidence to support the district court's conclusion at that time that Buckley's guilty plea was knowing and intelli-

---

**4.** We reject Buckley's suggestion to the district court that he should be allowed to withdraw his plea because of his legal innocence, *viz.*, that he lacked the mens rea for the alleged offenses. This argument misses the whole point of an *Alford* plea. By definition, defendants who make *Alford* pleas do not deny their legal innocence. This does not mean they can withdraw these pleas willy-nilly.

**5.** The court also indicated its reliance on Buckley's current demeanor before the court and on the fact that the government would be prejudiced by the plea withdrawal because it was now too late to seek an indictment of Buckley's brother. *See United States v. Kobrosky*, 711 F.2d 449, 455–56 (1st Cir.1983) (discussing prejudice to government). We need not consider these matters, for we find that the district court did not abuse its discretion in ruling that Buckley's asserted reason for withdrawing his plea was essentially bogus. It *is* thus of no moment whether the government was prejudiced.

gent. We note at the outset that the colloquy itself complied technically with all requirements of Rule 11. The court fully spelled out the charges against Buckley, their elements, the penalties therefor, and the evidence the government would offer to prove these charges. The court also demonstrated a special concern, since Buckley's plea was an *Alford* plea, with Buckley's reasons for pleading guilty. The court explained to Buckley his rights associated with a jury trial, and elicited responses from Buckley that, on their face, strongly suggest that he understood these rights and that he knowingly waived them by pleading guilty. Buckley's responses to the court's inquiries were both coherent and rational; they reflected Buckley's interest in the dialogue and demonstrated an astute understanding of the issues.

■ The district court's adherence to Rule 11 does not, to be sure, insulate from review its conclusion that the plea was valid. Since a guilty plea amounts to the waiver of a cluster of constitutional rights, the ultimate question is whether Buckley's plea was an "intentional relinquishment or abandonment of a known right or privilege." *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1170–71, 22 L.Ed.2d 418 (1969) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Yet, as the Supreme Court has suggested, the record produced in a meticulously conducted Rule 11 colloquy such as this greatly facilitates both the district court's determination of the voluntariness of the plea and our later review of challenges to that determination. *Id.* at 465–67, 58 S.Ct. at 1023–24. We find the district court's conclusion here fully warranted. The record affirmatively suggests that Buckley had no trouble understanding the constitutional rights at issue and that he waived these rights by pleading guilty. The court, in response to Buckley's questions, provided careful explanations of points as to which clarification was sought—as, for example, the presumption of innocence. Not only did Buckley appear to come to understand this legal concept, but the ensuing dialogue on the ultimate burden of proving insanity was quite sophisticated.

It is true that the "burden-of-proof" exchange and some of Buckley's other remarks tended to be rambling. The record also reflects Buckley's anger, cynicism, and bitterness. Yet reading the record as a whole, we do not believe that Buckley's discursiveness and emotion were reflective of irrationality, so as to render him incapable of making a knowing and intelligent waiver. For example, when asked by the court to explain his reasons for pleading guilty, Buckley launched into a discussion of his personal experience with the insanity defense. Yet his response also indicates that his guilty plea was the product of a thoughtful weighing of the plea's costs (*e.g.*, waiving a possible defense, vindicating a possible constitutional wrong) and benefits (*e.g.*, protecting his brother, reducing his own potential imprisonment, avoiding an indeterminate sentence). Another example of the coexistence of these same attributes is evident in the dialogue between Buckley and the court on the issue of coercion. *See supra.* Notwithstanding Buckley's references to "free will and determinism" and "totalitarian technique[s]," our examination of this exchange leaves little doubt that Buckley ultimately grasped the court's question, and that he did not believe his plea was coerced. In short, the flavor of Buckley's remarks is consistent with the district court's conclusion that his plea was voluntary.

■ Nor did the district court err by refusing to credit Buckley's theory, advanced at the plea withdrawal hearing, that the guilty plea was infirm because at the time Buckley tendered it he had been under heavy doses of lithium, which rendered him incompetent. We have examined the "new evidence" Buckley enlisted in support of this theory, namely, the reports of the two doctors, Jones and Corwin, who examined Buckley between the time of his guilty plea and the time of his withdrawal attempt. Both doctors agreed that Buckley was a manic-depressive; that lithium is the drug of choice for manic-depressives; that lithium reduces the intensity and frequency of

the mood swings manic-depressives have; that Buckley stopped taking lithium after tendering his guilty plea; and that Buckley's refusal to take lithium was *detrimental* to his mental health. Far from supporting Buckley's contention that lithium rendered him incapable of entering a rational plea, this evidence indicates just the opposite: that while medicated, he would be more rational than when, after the plea, he stopped taking lithium. We believe this evidence gave the district court cause to be skeptical rather than supportive of Buckley's theory of his incompetence.

■■■ In sum, since Buckley did not give the district court a valid reason for withdrawing his plea, the court did not abuse its discretion in denying Buckley's motion. Nor do any of the plea challenges Buckley makes for the first time on appeal suggest plain error below. *See* Fed.R. Crim.P. 52(b).[6] Buckley also argues on appeal that the district court should have sua sponte held an evidentiary hearing to determine whether Buckley was competent to plead guilty. Our discussion of the plea colloquy itself indicates our belief that the court's failure to do this was not error, assuming without deciding that we were to apply the rule of the case cited by Buckley, *Spikes v. United States,* 633 F.2d 144 (9th Cir.1980) (court must hold competence hearing sua sponte if it has a good faith reason to doubt the accused's competence).

---

6. We consider only the more plausible of these arguments, which we have culled not only from Buckley's pro se appellate brief but also from the reply brief of his subsequently appointed attorney: 1) Buckley's plea was invalid because it was made under duress; 2) the plea was invalid because Buckley misunderstood the charge to which he pleaded guilty, perhaps in part because the indictment was never read to him at his arraignment as required by Fed.R. Crim.P. 10; 3) the presence of *John* Buckley's lawyer at the plea colloquy tainted the plea and rendered it involuntary; 4) the plea bargain was fundamentally unfair because the new sentencing guidelines, *see* 28 U.S.C. § 994(*1*)(2) (Supp. II 1984), discourage the imposition of consecutive terms of imprisonment for a substantive offense and a conspiracy to commit that same offense, the same combination of charges in Buckley's indictment.

The first of these arguments is touched upon in our discussion of the plea colloquy in the text. Suffice it to say that the sort of threats Buckley felt he was under—*e.g.,* the threat of having his brother indicted—did not make his plea involuntary as a matter of law.

The second argument is undermined by Buckley's statement at the plea colloquy that he had discussed the charges with his attorney and that he understood the charges. Any error made by the district court in failing *personally* to apprise Buckley of the precise nature of the charges against him was thus harmless. *See* Fed.R. Crim.P. 11(h). And although the record does not reflect that the indictment was read to Buckley at his arraignment, as it should have been, the Advisory Committee's notes on Rule 10 suggest that this "technical irregularity" cannot be considered plain error.

Buckley's third point is equally unpersuasive. To the extent this argument is a challenge to the substantive unfairness of a plea bargain such as this one, where the government promises lenient treatment of a pleading defendant's family member, our reading of the record as a whole fails to convince us that the sanctioning of this agreement was error. Although courts have noted the potential danger inhering in this sort of bargain, *Bordenkircher v. Hayes,* 434 U.S. 357, 364 n. 8, 98 S.Ct. 663, 668 n. 8, 54 L.Ed.2d 604 (1978), a danger that imposes a special responsibility on the district court to ascertain a plea's voluntariness, *United States v. Daniels,* 821 F.2d 76, 80 (1st Cir.1987); *United States v. Tursi,* 576 F.2d 396, 398 (1st Cir.1978), we are satisfied that the district court here considered the terms of the bargain with appropriate care. Moreover, Buckley's lawyer stated at the Rule 11 colloquy that he thought the government had a strong case against Buckley's brother, diminishing the possibility that the government was abusing its considerable bargaining leverage. *See Mosier v. Murphy,* 790 F.2d 62, 66 (10th Cir.1986); *United States v. Nuckols,* 606 F.2d 566, 569–70 (5th Cir.1979). *See also Kent v. United States,* 272 F.2d 795, 798 (1st Cir.1959) ("If a defendant elects to sacrifice himself [to protect someone close to him] that is his choice, and he cannot reverse it after he is dissatisfied with his sentence, or with other subsequent developments.").

Buckley's fourth argument is also the subject of his section 2255 motion to vacate his sentence. *See* note 1, *supra.* He claims his attorney's failure to notify him of the sentencing guideline amounted to ineffective assistance of counsel. The short answer to this argument is that the statute providing the specific guideline cited by Buckley was not even enacted until October 12, 1984, some three months after Buckley pleaded guilty. Moreover, the guideline cited by Buckley did not take effect until November 1, 1987. Thus, the plea bargain was not unfair, nor was Buckley's lawyer ineffective for this reason. *See United States v. Twomey,* 845 F.2d 1132, 1134–35 (1st Cir.1988) (guidelines do not apply).

## II. SENTENCING

At the conclusion of the hearing discussed above, the district court, having orally denied Buckley's plea withdrawal motion, provisionally sentenced Buckley and committed him for observation in accordance with 18 U.S.C. § 4205(c) & (d) (1982). Final sentence was to be imposed upon completion of a study of Buckley by the Federal Bureau of Prisons. *Id.* In making this sentencing decision, the court relied in part upon information contained in a report of Buckley's pre-sentence investigation ("report").[7] *See* Fed.R.Crim.P. 32(c). In anticipation of the hearing, Buckley's attorney, Keefe, had been given a copy of the report. Buckley himself had been allowed to review a copy of the report shortly before the hearing was to commence. At the hearing, counsel for both sides referred to materials contained in the report. At no point during this hearing did either Buckley or Keefe contest the accuracy of anything in the report.

Hearing on the final imposition of sentence was held on June 7, 1987.[8] Discussion centered on the pre-sentence report, which was now supplemented by the recently (mid-May) completed study of the Bureau of Prisons.[9] Keefe told the court that he himself had received the pre-sentence report, including the Bureau of Prisons materials, and that he had shown the report to Buckley during a 45 minute conference the two had had immediately prior to the hearing. Keefe told the court that Buckley had "read the report completely," but added that Buckley "wanted more time to review it." Buckley himself addressed the court. He claimed he had only read "three or four pages" of the report, that he needed more time to "digest" it, that he had been frustrated in previous attempts to get the report, and that he had many objections to the report. Although Buckley did not specify or particularize his objections to the report,[10] he did indicate, through Keefe, that he wanted to cross-examine one of the doctors who had written a report for the Bureau of Prisons, apparently because of the report's alleged "misrepresentations and erroneous statements." The court responded to Buckley's and Keefe's statements as follows:

> Well, the Court has reviewed and in fact studied in great detail the report. The report is returned for the benefit of the Court in answer to specific questions which the court proposed and the Court is satisfied with the content of the report. This defendant was heard fully on a prior occasion with respect to the matter of sentence and the only reason that final sentence was not imposed at that time was that the Court wished to have the opportunity to obtain answers to the questions which the Court has indicated in the report to have asked of people in the place of his incarceration of a professional nature, and the Court is prepared at this time to impose sentence.

---

7. This report consisted of an eight-page report, mostly biographical, compiled by a probation officer; a copy of the plea agreement; two short reports from Florida probation officers pertaining to incidents in Buckley's past; and a four-page letter from Buckley's girlfriend to federal authorities.

8. Three weeks before this final sentencing hearing, Buckley had written a letter to the district court advising it that he had fired Keefe and wished to proceed pro se. Keefe accompanied Buckley to the June 7 hearing; at the beginning of the hearing he told the court Buckley wished to continue pro se, and that he, Keefe, would merely play an advisory role. Notwithstanding these pronouncements, the record indicates that Keefe continued to speak on behalf of Buckley, without the latter's objection, for the remainder of the hearing. Although on appeal Buckley contends that the district court denied him his right to self-representation at this hearing, *see Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), Buckley's assertion of this right was less than unequivocal, as required. *See Tuitt v. Fair,* 822 F.2d 166, 173–77 (1st Cir.1987) (holding that assertion of right to self-representation must be asserted unequivocally).

9. The Bureau of Prisons report included a nine-page "psychological report" by a clinical psychologist and a four-page "psychiatric evaluation" by a psychiatrist.

10. Because Buckley failed to particularize these objections we reject his claim on appeal that the district court erred by failing to make factual findings addressing such disputes as required by Fed.R.Crim.P. 32(c)(3)(D).

The court proceeded to impose a five-year sentence. In response to Keefe's objection to the court's imposition of sentence prior to giving Buckley and/or himself an opportunity to be heard, the court said,

> Mr. Keefe, let me explain the Court's position on that. I heard both you and Dr. Buckley on the prior occasion when he was before the court when he was sentenced to go to the institution under the provisions of law that permitted me to get a psychiatric evaluation. I heard him fully at that time.
>
> MR. KEEFE: I understand that.
>
> THE COURT: Except that I had those outstanding questions about his psychiatric condition, I was fully prepared to impose sentence finally at that time, but in order to give him the benefit of my being fully apprised of what were the circumstances with respect to the questions which I had, I imposed a provisional sentence in order that I might be advised by the psychiatric authorities as to what their views were with respect to these matters. I have now been so advised and I have imposed a final sentence. He has been fully heard throughout these proceedings with respect to the matters that he is legally entitled to be heard on....

Buckley makes several challenges to these sentencing proceedings, two of which warrant discussion. First, he claims he was denied his right of allocution—his right to address the court personally prior to being sentenced. *See* Fed.R.Crim.P. 32(a)(1)(C). Second, he claims he was given insufficient access to his pre-sentence report, both before and after he was sentenced. *See* Fed.R.Crim.P. 32(c).

 Fed.R.Crim.P. 32(a)(1)(C) provides that the court, before imposing sentence, shall

> address the defendant personally and ask the defendant if the defendant wishes to make a statement in the defendant's own behalf and to present any information in mitigation of punishment.

The rule mandates precisely what it appears to mandate: a personal inquiry directed to the defendant himself. *United States v. Dickson,* 712 F.2d 952, 956 (5th Cir.1983). It is apparent from the record of the June 7, 1985, hearing at which Buckley's final sentence was imposed that this personal inquiry did not take place. Nor was the defect in this sentencing hearing eliminated, as the district court seemed to think, by the generous allocution opportunity the district court had afforded Buckley when he was provisionally sentenced, three months earlier, under 18 U.S.C. § 4205(c). The Supreme Court has made clear that the right of allocution must be extended to a defendant when he is *finally* sentenced under section 4205(c). *United States v. Behrens,* 375 U.S. 162, 163–66, 84 S.Ct. 295, 295–97, 11 L.Ed.2d 224 (1963) (case under precursor to section 4205(c)). Accordingly, we remand for resentencing in accordance with Rule 32(a)(1)(C). *See United States v. Turner,* 741 F.2d 696, 698–99 (5th Cir.1984) (remanding).

 Buckley's argument about his lack of access to the pre-sentence investigation report proceeds on two fronts. First, he claims he was unable to mount an effective challenge to the report at the final sentencing hearing because his only access to the report was during the hour immediately prior to the hearing. Second, he claims that his inability to obtain the report *after* he was sentenced diminished his ability to make an effective appeal from the district court's denial of his plea withdrawal motion.

Fed.R.Crim.P. 32(c)(3)(A) requires a court to permit a defendant to read the report at a "reasonable time before imposing sentence." Given that the very purpose of the disclosure requirement is to allow the defendant a chance to notice any inaccuracies upon which the court may rely in making its sentencing decision, we consider the very short time afforded Buckley was insufficient. Although Buckley had read some of the report prior to his provisional sentencing hearing in February, he had not had a chance to read the Bureau of Prisons report until just before final sentencing. *Cf. United States v. Mosquera,* 845 F.2d 1122, 1124 (1st Cir.1988) (defendant must

have access to complete report). On remand Buckley is to be given access to the report at least ten days prior to sentencing, in accordance with 18 U.S.C. § 3552(d) (Supp. IV 1986), a statute that became effective November 1, 1987, unless the district court determines that such disclosure is harmful for the reasons stated in Fed.R.Crim.P. 32(c)(3)(A).

■ As to Buckley's second argument relative to the report, we note that under Fed.R.Crim.P. 32(c)(3)(E) all copies of the report are to be returned to the probation officer following the imposition of sentence "unless the court, in its discretion otherwise directs." In short, the Federal Rules of Criminal Procedure do not give Buckley a right to see his report once he has been sentenced.[11] We cannot say the district court abused its discretion in denying Buckley's many post-sentence motions to obtain a copy of the report. (The court did, in fact, allow Buckley a limited opportunity to see the report.) Although Buckley claims he needed the report to prepare his appeal from the denial of his plea withdrawal motion, Buckley had read the report as it then existed prior to the hearing at which that motion was denied. Neither he nor his attorney made any challenge to the report during the plea withdrawal hearing. And the Bureau of Prisons supplement to the report, to which Buckley did object at his final sentencing hearing, did not exist when the court denied his plea withdrawal motion. Therefore, the district court's denial of Buckley's motion could not have been tainted by reliance on information to which Buckley did not have an opportunity to respond.

*We affirm the judgment and remand for resentencing in accordance herewith.*

---

**11.** The record does not indicate that Buckley sought access to his report under the Freedom of Information Act, 5 U.S.C. § 552 (1982). *See*

*United States Department of Justice v. Julian,* —— U.S. ——, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988).