UNITED STATES, Appellee,

v.

Carlos MARTINEZ–MOLINA,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Luis MALDONADO–RODRIGUEZ,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Alfonso RODRIGUEZ–RESTO,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Angel RODRIGUEZ–RODRIGUEZ,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Angel FELICIANO–COLON,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Luis MAYSONET–MACHADO,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Rafael E. VELEZ–MATOS,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Victor NOBLE–CANALES,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Eddie TRAVIESO–OCASIO,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Oscar PAGAN–GARCIA, Defendant–
Appellant.

Nos. 94–1249 to 94–1255, 94–1325,
94–1631 and 94–1791.

United States Court of Appeals,
First Circuit.

Argued March 8, 1995.

Decided Aug. 30, 1995.

Teodoro Mendez–Lebron, by Appointment of the Court, for appellant Carlos Martinez–Molina.

Laura Maldonado–Rodriguez, Asst. Federal Public Defender, with whom Benicio Sanchez–Rivera, Federal Public Defender, was on brief, for appellant Luis Maldonado–Rodriguez.

Ramon Garcia, by Appointment of the Court, on brief, for appellant Alfonso Rodriguez–Resto.

Eric B. Singleton, for appellant Angel Rodriguez–Rodriguez.

Frank Pola, Jr., by Appointment of the Court, for appellant Angel Feliciano–Colon.

Manuel San Juan, by Appointment of the Court, for appellant Luis Maysonet–Machado.

Miriam Ramos–Grateroles, by Appointment of the Court, for appellant Rafael E. Velez–Matos.

Thomas R. Lincoln, by Appointment of the Court, with whom Law Offices of Thomas R. Lincoln, was on brief for appellant Victor Noble–Canales.

Maria H. Sandoval, for appellant Eddie Travieso–Ocasio.

Lydia Lizarribar–Masini, for appellant Oscar Pagan–Garcia.

Joseph C. Wyderko, Atty., Dept. of Justice, with whom Guillermo Gil, U.S. Atty., and Esther Castro–Schmidt, were on brief, for appellee.

Before TORRUELLA, Chief Judge, SELYA and CYR, Circuit Judges.

TORRUELLA, Chief Judge.

Appellants and four codefendants were arrested at the Barbosa Park in Santurce, Puerto Rico, after a Drug Enforcement Administration ("DEA") agent observed them participating in what appeared to be a drug transaction. The defendants moved to suppress evidence obtained pursuant to the arrest on the grounds that the arrests and subsequent searches were made without probable cause. The district court denied their motions, and the appellants entered conditional guilty pleas. Several appellants subsequently claimed that their guilty pleas were coerced and moved to withdraw them. The district court denied these motions as well.

Appellants now appeal the denial of the motions to suppress and motions to withdraw their guilty pleas. For the following reasons, we affirm in part and reverse in part.

## STATEMENT OF FACTS

We recite the facts adduced at a suppression hearing in the light most favorable to the district court's ruling to the extent that they derive support from the record and are not clearly erroneous. *United States v. Sealey*, 30 F.3d 7, 8 (1st Cir.1994).

On July 1, 1993, at approximately 2:30 p.m., DEA Agent Carlos Rivera ("Agent Rivera") was driving past Barbosa park when he noticed eight or nine men grouped around a concrete bench near one of the park's basketball courts. Seven or eight vehicles were parked in a row alongside the group of men. Appellant Luis Maldonado–Rodríguez ("Maldonado") was talking on a cellular phone and another man in the group had a cellular phone attached to his waist. Agent Rivera observed that the men were not dressed to play basketball and did not appear to have coolers, sodas, or alcoholic beverages. Agent Rivera testified that although he did not

know any of the men by name, he had occasionally seen Maldonado near a drug distribution spot in a local housing project.

Agent Rivera parked his car in the adjoining parking lot and began to surveil the group through binoculars. Besides Maldonado, the group included appellants Alfonso Rodríguez–Resto ("Rodríguez–Resto"), Eddie Travieso–Ocasio ("Travieso"), Angel Feliciano–Colón ("Feliciano"), Víctor Noble–Canales ("Noble"), Luis Maysonet–Machado ("Maysonet"), and Rafael E. Vélez–Matos ("Vélez"). Codefendants Enrique Romero–Carrión ("Romero"), Carlos Rubén Tejada–Morales ("Carlos Tejada"), Angel David Tejada–Morales ("Angel Tejada") were also present.[1]

About ten minutes later, Agent Rivera saw a black Nissan Pathfinder drive up and park behind Maldonado's Red Suzuki jeep. The passenger of the black Pathfinder (the "Passenger")[2] exited the vehicle and conversed with Maldonado, Travieso, Feliciano, and Romero. The Passenger then removed a large handbag from the rear of the black Pathfinder and placed it between a white GMC van and a gray Mercury Cougar parked side-by-side next to the basketball court. The Passenger removed a second handbag from the black Pathfinder and placed it next to the first.

Agent Rivera then drove through the parking lot to get a closer look. As he passed by, he saw Maldonado, Travieso, Feliciano, Romero, and the Passenger gathered around the handbags. Agent Rivera testified that the Passenger was handling square-shaped packages that appeared to contain cocaine. Agent Rivera also noticed that the sliding door of the white GMC van was open, although he could not see anything inside.

After returning to his previous surveillance post, Agent Rivera saw Noble, Maysonet, Carlos Tejada, and Angel Tejada standing near the black Pathfinder. Agent Rivera also observed Travieso and Romero apparently arranging something in the rear of a

black Pontiac station wagon. Agent Rivera did not observe them carry anything to the black station wagon. Several minutes later, the black Pathfinder left the parking lot. Agent Rivera then left his surveillance post and called his office for backup. Around the same time as Agent Rivera returned to his post, appellant Angel Rodríguez–Rodríguez ("Rodríguez–Rodríguez") arrived in a black Chevrolet Lumina, joined the group for three or four minutes, and then left.

Appellants Oscar Pagán–García ("Pagán") and codefendant Roberto Maldonado–Torres ("Maldonado–Torres") arrived in a red Ford Mustang about five minutes later. Agent Rivera observed Travieso approach the Mustang and lean his body inside the vehicle as if he were looking for something. Travieso removed an object (which Agent Rivera could not identify) from the red Mustang and headed towards the gray Toyota Tercel. When he returned, he took a green handbag from the red Mustang and brought it to the rear of that vehicle. Pagán exited the driver's side of the red Mustang and opened its trunk. Agent Rivera testified that the trunk remained open for several seconds, but that he was unable to discern what happened to the green handbag. A few seconds later, Maldonado–Torres exited from the passenger's side of the red Mustang and accompanied Travieso and Pagán as they joined the group near the bench. Shortly thereafter, Rodríguez–Rodríguez returned to the parking lot in the black Lumina and rejoined the group.

Several minutes later, Rodríguez–Resto and Romero left the parking lot in the black Pontiac station wagon. By this time, several other DEA agents had joined Agent Rivera. Agent Rivera followed the black station wagon as it circled the park while the other agents continued to surveil the parking lot. Agent Rivera testified that Rodríguez–Resto and Romero appeared to him to be conducting countersurveillance in an effort to ferret out any "tails."[3] After Rodríguez–Resto and

---

1. Romero, Carlos Tejada, and Angel Tejada are not parties to this appeal.

2. The driver and passenger of the black Pathfinder were never identified.

3. Specifically, Agent Rivera testified that Rodríguez–Resto and Romero were "buscando rabo ... which indicates that they were looking around, checking on surveillance to see who's watching them.... [T]hey're looking through

Romero returned to the parking lot, Agent Rivera joined the other agents at his prior surveillance post.

A few moments later, appellant Carlos Martínez–Molina ("Martínez") arrived in a black Toyota Supra and the six DEA Agents decided to intervene. The Agents, all clad in DEA jackets, identified themselves as law enforcement personnel and moved in to detain the group. Vélez, Martínez, Romero, and Maldonado–Torres were all detained as they attempted to flee the scene. Martínez discarded an airplane ticket while fleeing. Agent Rivera also found an abandoned cellular phone nearby. The Agents also seized airline tickets from Feliciano, Pagán, Noble, Maysonet, Carlos Tejada, and Angel Tejada. All of the seized tickets had been issued under false names for a flight from Puerto Rico to New York later that afternoon. Rodríguez–Resto, Travieso, Noble, Pagán, Carlos Tejada, Angel Tejada, and Romero were all found to be carrying over $1,000 in cash.

Agent Rivera testified that after all fourteen men had been arrested, he observed suitcases in three of the vehicles: the red Suzuki, the white van, and the black station wagon. He also testified that twelve yellow, U.S.D.A. Agricultural inspection stickers were in plain view on the front seats and dashboards of six of the vehicles. Agent Rivera testified that, based on his experience in law enforcement, he knew that drug smugglers commonly used these stickers to bypass agricultural inspection at the airport. The Agents then searched all of the vehicles. Seven of the vehicles contained two suitcases each, for a total of fourteen suitcases. The Agents also found two handbags in the black station wagon, including the green handbag Travieso had removed from the red Mustang. The Agents found $3,000 in cash in the black Lumina and an unused airline ticket for a flight on the previous day in a Red Mazda Protege.

The men were all handcuffed and taken to the DEA offices. The Agents obtained a search warrant for the suitcases and hand-

bags after a drug detection dog indicated the probable presence of narcotics in eleven of the suitcases and both handbags. Each of the eleven suitcases contained thirty to forty kilograms of cocaine. Neither handbag was found to contain cocaine.

## PROCEDURAL HISTORY

The defendants all moved to suppress the evidence seized from their persons and vehicles. The district court denied the motions to suppress, and all ten appellants entered conditional guilty pleas to possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a). In exchange for each appellant's written plea agreement, the government agreed to limit each appellant's relevant conduct to fifteen kilograms for the purpose of sentencing. The plea agreements were part of a "package deal" and were contingent on all of the defendants in this case accepting the plea offer and entering a plea of guilty. The plea agreements provided that "should any of the defendants decide to change his plea according to the offer, the plea is automatically withdrawn as to all of the defendants." Carlos Tejada, Angel Tejada, and Romero had elected to go to trial and were excepted from this requirement.

All ten appellants entered their guilty pleas on October 20, 1993. Later that day, the jury trial commenced for codefendants Carlos Tejada, Angel Tejada, and Romero. At the conclusion of the government's case, the court granted Carlos Tejada's motion for acquittal. On October 27, 1994, the jury acquitted Angel Tejada and convicted Romero.

On November 16, 1993, Rodríguez–Resto moved to withdraw his guilty plea. Travieso and Vélez both moved to withdraw their guilty pleas on January 31, 1994, the day of the sentencing hearing. The district court denied all three motions.[4]

---

their rear view mirrors, looking all over the place to see who's watching them."

4. The district court also denied the motions to withdraw the guilty pleas of three other defendants. These defendants, however, do not appeal this issue.

## THE MOTIONS TO SUPPRESS

### I. *Lawfulness of Arrests*

■ Nine appellants—Maldonado, Rodríguez–Resto, Rodríguez–Rodríguez,[5] Feliciano, Maysonet, Vélez, Noble, Travieso, and Pagán—argue that they were arrested without probable cause, and that therefore the items seized during their arrest should have been suppressed.

### A. *Standard of Review*

■ With respect to a motion to suppress, we review a district court's findings of fact only for clear error. *Sealey,* 30 F.3d at 9; *United States v. Maguire,* 918 F.2d 254, 257 (1st Cir.1990), *cert. denied,* 499 U.S. 950, 111 S.Ct. 1421, 113 L.Ed.2d 474 (1991). This deferential standard is appropriate because the district court has a superior sense of what actually transpired during an incident by virtue of its ability to see and hear the witnesses who have firsthand knowledge of the events. *United States v. Zapata,* 18 F.3d 971, 975 (1st Cir.1994). Questions of law, however, are subject to *de novo* review. *Id.*

### B. *Applicable Law*

■ Law enforcement officers may effect warrantless arrests provided that they have probable cause to believe that the suspect has committed or is committing a crime. *United States v. Watson,* 423 U.S. 411, 416–18, 96 S.Ct. 820, 824–25, 46 L.Ed.2d 598 (1976); *Gerstein v. Pugh,* 420 U.S. 103, 113–14, 95 S.Ct. 854, 862–63, 43 L.Ed.2d 54 (1975). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts," *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983), and as such "must be evaluated in light of the totality of circumstances." *United States v. Torres–Maldonado,* 14 F.3d 95, 105 (1st Cir.1994) (quoting *United States v. Uricoechea–Casallas,* 946 F.2d 162, 165 (1st Cir.1991)). Moreover, in order to establish probable cause, the government "need not present the quantum of proof necessary to convict." *Id.* at 105 (quoting *Uricoechea–Casallas,* 946 F.2d at 165). *See also United States v. Morris,* 977 F.2d 677, 684 (1st Cir.1992) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 1588, 123 L.Ed.2d 155 (1993); *United States v. Figueroa,* 818 F.2d 1020, 1023 (1st Cir.1987) (same). Rather, it need only show that at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense. *Torres–Maldonado,* 14 F.3d at 105; *see also Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

■ Of course, probable cause must exist with respect to each person arrested, and "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (citing *Sibron v. New York,* 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968)); *see also United States v. Diallo,* 29 F.3d 23, 25 (1st Cir.1994). Rather, "some additional circumstances from which it is reasonable to infer participation in criminal enterprise must be shown." *United States v. Burrell,* 963 F.2d 976, 986 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992) (quoting *United States v. Hillison,* 733 F.2d 692, 697 (9th Cir.1984)).

---

5. Nothing was seized from the person of Rodríguez–Rodríguez. Rather, he seeks to suppress the cash found in his Black Lumina. In this regard, he argues that his arrest was unlawful and accordingly the search of the vehicle was not a valid search-incident-to-arrest. *See New York v. Belton,* 453 U.S. 454, 460–61, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

The government, however, no longer attempts to justify the vehicle searches as incident to lawful arrest, contending instead that there was probable cause to search the vehicles. "Under the 'automobile exception,' the only essential predicate for a valid warrantless search of a motor vehicle by law enforcement officers is probable cause to believe that the vehicle contains contraband or other evidence of criminal activity." *United States v. McCoy,* 977 F.2d 706, 710 (1st Cir.1992) (citations omitted). Therefore, provided there was probable cause to search the vehicle at the time of Rodríguez–Rodríguez' arrest, the search was valid even if the arrest was not, as the police would have had an independent basis for searching the vehicle, apart from any exploitation of illegal conduct. *Id.* at n. 4. *See also Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975); *United States v. Pimental,* 645 F.2d 85, 86 (1st Cir.1981). Therefore, in addressing Rodríguez–Rodríguez' motion to suppress, we need not decide whether his arrest was unlawful.

In assessing the significance of a defendant's association to others independently suspected of criminal activity, the *Hillison* court looked to whether the known criminal activity was contemporaneous with the association and whether the circumstances suggest that the criminal activity could have been carried on without the knowledge of all persons present. *See Hillison*, 733 F.2d at 697 (citations omitted). Other courts have focused on the nature of the place in which the arrest occurred and whether the individual himself was behaving suspiciously or was merely "tainted" by another. *See United States v. Tehrani*, 49 F.3d 54, 59 (2d Cir. 1995).

A survey of the relevant caselaw makes clear, however, that it is often difficult to determine precisely what additional factors are sufficient to create the requisite inference of participatory involvement. In *Ybarra*, 444 U.S. at 90–91, 100 S.Ct. at 341–42, officers had a warrant to search a bar and its bartender for heroin. They conducted a patdown search of Ybarra, a bar patron, despite the fact he had made no gestures suggesting criminal conduct, no attempts to conceal contraband, and no suspicious statements. In declaring the search invalid, the Court noted that the officers "knew nothing more about Ybarra except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Id.* at 91, 100 S.Ct. at 342. *See also Swint v. City of Wadley, Alabama*, 51 F.3d 988 (11th Cir.1995) (holding that the legitimate search and seizure of one suspect in a public place cannot be bootstrapped into probable cause for a broadbase search of the business establishment and its patrons).

Similarly, in *Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968), the Court held that probable cause was not established by the mere fact that the defendant spoke to a number of known narcotics addicts over a period of eight hours where the arresting officer was completely ignorant regarding the content of the conversation and saw nothing pass between the defendant and the addicts. *See also United States v. Chadwick*, 532 F.2d 773, 784 (1st Cir.1976), *aff'd on other grounds* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (mere act of picking up suspected drug traffickers at the train station and helping them load a contraband-laden footlocker into car does not, without more, constitute probable cause); *United States v. Di Re*, 332 U.S. 581, 593, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948) (holding that "[t]he argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out ... and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal").

In contrast, the cases in which courts find that probable cause exists generally involve substantially more than a momentary, random, or apparently innocent association between the defendant and the known criminal activity. For instance, in *United States v. Patrick*, 899 F.2d 169 (2d Cir.1990), the court upheld the search of a male defendant (Patrick) who crossed the border from Canada into New York at about the same time as a woman (Taylor) who was found to be carrying narcotics. *Id.* at 170. When the two entered the Immigration Office, there were no other travellers present, and both defendants told the same unusual story: they had accidentally crossed the border by bus and were simply returning to the United States. *Id.* at 171. When cocaine base was found in the woman's purse, the man was also arrested. *Id.* at 172. Distinguishing *Ybarra*, the court found that the fact that the man and woman had simultaneously entered the Immigration Office at a time when no others were present and that both told the same unusual story "provided an adequate basis for the officials to reasonably believe that Patrick was not just a mere innocent traveling companion but was travelling and acting in concert with Taylor in transporting the cocaine." *Id.*

Similarly, in *United States v. Halliman*, 923 F.2d 873, 881–82 (D.C.Cir.1991), police officers suspected that a group of narcotics traffickers was living at and operating out of several rooms at the Holiday Inn. *Id.* at 875.

Pursuant to a valid search, the officers seized a substantial amount of cocaine and arrested defendant Halliman. *Id.* at 876–77. Subsequently, two men entered the hotel lobby and headed for the rooms that had just been searched. The night manager informed police that the two men were "in the group" of narcotics traffickers who had been frequenting the hotel for the past month. The men stopped in front of one of the rooms in which the cocaine had been seized and contemplated the broken lock. The police then arrested them and seized the cocaine they were carrying. *Id.* at 877. In upholding the arrest, the court distinguished *Ybarra* by noting that "the police here were aware of more than a momentary, casual, or random association among the defendants, the location, and Halliman." *Id.* at 882.

In *Hillison*, 733 F.2d at 697, the defendant registered at a hotel under an alias and occupied a room adjacent to two men known to be engaged in narcotics trafficking. The three men visited back and forth between the two rooms and used their automobiles interchangeably. The court found probable cause to arrest the defendant based on his close association with the drug traffickers over the course of three days, noting that "it taxes credulity to assert that [the defendant] spent as much time in [the drug-traffickers'] company ... without knowing about their drug dealing activity." *Id.*

In *United States v. Holder*, 990 F.2d 1327, 1329 (D.C.Cir.1993), the court found probable cause to arrest a defendant found at the scene of a narcotics transaction. The court's analysis focused on the fact that the transaction occurred in a private apartment where the drugs were openly on display. The court distinguished *Ybarra*, stating that while Ybarra's "presence in a public tavern was ostensibly innocent, [the defendant's] presence in a private apartment just a few feet from a table full of cocaine can hardly be so described.... The logical inference ... was

that [he] was either a party to the distribution of drugs or a customer." *Id.*

With these principles in mind, we turn to the claims of each appellant.

### C. *Analysis*
#### 1. *Travieso, Maldonado, and Feliciano*

■ We first consider the claims of appellants Travieso, Maldonado, and Feliciano. The record indicates that although the men were in a park near a basketball court, they were neither dressed to play nor visibly equipped for a social gathering. Agent Rivera also witnessed Maldonado talking on a cellular phone, which we have previously noted to be a "known tool[ ] of the drug trade." *United States v. De La Cruz*, 996 F.2d 1307, 1311 (1st Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 356, 126 L.Ed.2d 320 (1993). While these facts might not be enough alone to constitute probable cause, they do weigh in our evaluation of the "totality of the circumstances." More significant, however, are Agent Rivera's subsequent observations. He testified that after the black Pathfinder arrived, the Passenger removed two handbags from the vehicle and placed them between the white van and gray Cougar. Agent Rivera testified further that Travieso, Maldonado, and Feliciano all gathered around as the Passenger handled what appeared to be packages of cocaine.[6] We think that these facts would lead a prudent person to believe that a large-scale cocaine transaction was transpiring and that Travieso, Maldonado, and Feliciano were involved. We accordingly hold that their arrests were supported by probable cause.

#### 2. *Rodríguez–Resto, Maysonet, Vélez, and Noble*

We now consider whether the arrests of appellants Rodríguez–Resto, Maysonet, Vélez, and Noble were supported by the requisite probable cause. All four argue that they were improperly arrested for their "mere

---

**6.** Appellants argue that Agent Rivera must have fabricated this testimony because the handbags seized did not contain cocaine and the packages of cocaine were all ultimately found in locked suitcases for which the appellants had no keys. Agent Rivera suggested on cross-examination, however, that the Passenger probably took the handbags with him when he left in the black Pathfinder. Because this interpretation of the events is supported by the record, we cannot find the district court's reliance on it to be clearly erroneous.

propinquity to others independently suspected of criminal activity." *Ybarra*, 444 U.S. at 91, 100 S.Ct. at 342. Although a close call, we disagree.

 While we acknowledge that the facts here are not clearly analogous to any of the cases discussed above, they are completely distinguishable from *Ybarra* and its progeny in that they indicate more than a "momentary, casual, or random association" between these four defendants, the location of the arrest, and those independently suspected of criminal activity. Applying the first factor enunciated by the *Hillison* court, we note that the connection between Rodríguez–Resto, Maysonet, Vélez, and Noble and the suspected criminal activity was contemporaneous: all four were among the original group of men that initially attracted Agent Rivera's attention by using a cellular telephone and gathering in street clothes in a public park. *See Hillison*, 733 F.2d at 697.

With regard to the second *Hillison* factor, we think it strains credulity to suggest that the cocaine transaction was being carried on without the knowledge of all persons present. *Id.* Admittedly, Rodríguez–Resto, Maysonet, Vélez, and Noble were not among the group that gathered around as the Passenger allegedly handled the packages of cocaine. Nevertheless, Agent Rivera's testimony clearly indicates that they were part of the group suspected of narcotics violations.

Agent Rivera testified that the group was bunched tightly and moved towards the Pathfinder when it arrived, suggesting that they knew or were expecting its occupants. Furthermore, their lack of either athletic gear or picnic accoutrements made it less likely that they were at the park for an unrelated and innocent activity, and therefore suggested that they were not ignorant of the criminal activity transpiring around them. Although these facts do not conclusively rule out the "innocent bystander" explanation, we think that they reasonably imply participatory involvement. As the Supreme Court has explained, the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Gates*, 462 U.S. at 232, 103 S.Ct. at 2317 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). We do not think officers in the field are required to divorce themselves from reality or to ignore the fact that "criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences." *United States v. Ortiz*, 966 F.2d 707, 712 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993).[7] Accordingly, we find that the arrests of Rodríguez–Resto, Maysonet, Vélez, and Noble were supported by probable cause.[8]

---

7. Although this observation was made with regard to a sufficiency-of-the-evidence challenge, we think it also applies in probable cause determinations.

8. Additional facts strengthen the probable cause finding against Vélez and Rodríguez–Resto.

Vélez fled when the Agents approached, and as the Supreme Court has held, flight at the approach of law enforcement officers, when coupled with specific knowledge relating the suspect to evidence of a crime, is a proper factor to be considered in the decision to make an arrest. *See Sibron*, 392 U.S. at 66–67, 88 S.Ct. at 1904–05; *see also United States v. Romero–Carrión*, 54 F.3d 15, 16 (1st Cir.1995) (related case in which we held that codefendant Romero's flight "evinced a keen consciousness of guilt"); *United States v. Paleo*, 967 F.2d 7, 9 (1st Cir.1992); *United States v. Cruz*, 910 F.2d 1072, 1077 (3d Cir.1990), *cert. denied*, 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991).

With regard to Rodríguez–Resto, Agent Rivera testified that he participated in a countersurveillance effort along with codefendant Romero. It is well settled that countersurveillance efforts are indicative of knowing participation in criminal activity. *E.g.*, *United States v. Delgado*, 4 F.3d 780, 788 (9th Cir.1993); *United States v. Iafelice*, 978 F.2d 92, 95 (3d Cir.1992); *United States v. Taylor*, 956 F.2d 572, 578 (6th Cir.1992) (reasonable suspicion could be inferred where defendant "had glanced furtively in every direction as if conducting 'countersurveillance'"). Here, Agent Rivera testified that Romero and Rodríguez–Resto were "looking around ... looking through their rear view mirrors, looking all over the place to see who's watching them." These observations, while arguably consistent with innocent driving, were sufficient to allow a trained officer to infer that Romero and Rodríguez–Resto were conducting countersurveillance and accordingly support our probable cause determination. *See Iafelice*, 978 F.2d at 95 (countersurveillance could be inferred where defendants were driving

### 3. *Pagán*

■ Appellant Pagán also claims that he was arrested for his "mere propinquity" to the others. We disagree. Although Pagán arrived after the black Pathfinder had left, his interaction with Travieso was sufficient for the officers to infer his participatory involvement in a drug transaction. Travieso was among the four who had gathered around when the Passenger handled the suspicious packages taken from the handbags retrieved from the back of the black Pathfinder. From this, Agent Rivera could reasonably have concluded that Travieso was intimately involved with the suspected drug transaction. Agent Rivera testified that when Pagán arrived in the red Mustang, Travieso immediately came over and inserted his entire torso into the car as if he were "searching for something inside the vehicle." Agent Rivera testified that Travieso then removed an object which he could not identify from the red Mustang. Travieso then extracted a green handbag and brought it to the rear of the red Mustang. Agent Rivera testified that Pagán then exited the vehicle, headed to the rear, and opened the trunk. A few seconds later, the trunk was closed and Agent Rivera could no longer see the green handbag. Pagán then accompanied Travieso, and they joined the group near the bench. We think that these events fairly imply participatory involvement. When Pagán arrived, Agent Rivera already had good reason to suspect that Travieso was in possession of handbags containing cocaine. When Travieso immediately retrieved two objects from Pagán's vehicle, one of which was a handbag which he apparently transferred to the trunk, Agent Rivera reasonably could have concluded that Pagán was also a knowing participant in the drug transaction.[9] We accordingly find that Pagán's arrest was supported by probable cause.

very slowly, looking all around, and staring at the occupants of all the cars they passed).

9. Moreover, the immediacy of Travieso's actions with respect to Pagán's arrival suggest that Travieso was expecting Pagán and knew his vehicle contained the handbags.

## II. *Lawfulness of the Vehicle Searches*

Appellants challenge the searches of seven of the eleven vehicles: the black Toyota Supra, the gray Nissan, the Red Suzuki, the white GMC van, the red Mazda Protege, the gray Cougar, and the black Lumina.[10]

■ The Supreme Court has ruled that an automobile may be searched without a warrant if the police have probable cause to believe that it contains contraband, evidence of a crime, or other matter that may lawfully be seized. *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). As in other contexts, probable cause to search a vehicle exists where the facts and circumstances known to the arresting officers are sufficient to cause a person of reasonable caution to believe the search is justified. *United States v. Infante–Ruiz*, 13 F.3d 498, 502 (1st Cir. 1994) (citing 3 Charles Alan Wright, *Federal Practice and Procedure: Criminal 2d* § 662 at 579 (1982)). That is, there must have been particular facts indicating that, at the time of search, the vehicle or a container within it carried contraband, evidence of crime, or other seizable matter. *Id.*

■ Before addressing whether probable cause existed as to each vehicle, we note that before they intervened, the arresting officers had probable cause to believe that the tightly gathered group in the parking lot was engaged in a large-scale cocaine transaction. Moreover, when the Agents approached, four members of the group attempted to flee, suggesting their knowing participation in illegal activity. Upon searching the arrested men, the Agents found large amounts of cash and seven plane tickets for a flight to New York later that afternoon, all issued under false names. Six suitcases were in plain view in three of the vehicles. Additionally, six of the vehicles contained U.S.D.A. stickers, commonly used by smugglers to bypass agri-

10. The searches of the remaining vehicles are either not challenged or are challenged in such a vague and perfunctory manner that we deem the challenge waived on appeal. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

cultural inspection at the airport. From these observations, a reasonable law enforcement officer could conclude that most, if not all, of the men were conspiring to transport narcotics into New York, and that they were using the vehicles parked at the scene to bring the narcotics to the airport.

### A. The black Supra and the gray Nissan

■ Martínez claims that his black Supra and gray Nissan were unlawfully searched. Initially, we note that Martínez owned two of the vehicles present at the park, and the police were aware of this fact.[11] This suggests that his presence with the other defendants at the park was by design rather than coincidence and significantly discounts any theory that he had merely stopped by to chat with some friends. Additionally, when the Agents intervened, Martínez fled, discarding a plane ticket in the process. Moreover, U.S.D.A. Agriculture stickers were in plain view in the vehicles. We think that these facts would lead a reasonably prudent person to believe that Martínez was using his vehicles to facilitate the narcotics conspiracy. We accordingly find that the searches of his vehicles were lawful.

### B. The red Suzuki

■ Maldonado maintains that the search of his red Suzuki jeep was unlawful. We disagree. Agent Rivera testified that two suitcases and two U.S.D.A. stickers were in plain view in the vehicle. Putting these observations in the context of the other observations and events, we think the officers were well warranted in believing that the vehicle was being used to facilitate the narcotics conspiracy. We accordingly find that the search of the red Suzuki was supported by probable cause.

### C. The white GMC van

■ Feliciano challenges the search of his white GMC van. Initially, we note that upon searching Feliciano, the Agents found an airline ticket issued under a false name, suggesting his involvement in the drug trans-

action. Moreover, when Agent Rivera observed the Passenger handling the suspicious packages, he was squatting between Feliciano's van and the gray Mercury Cougar. Agent Rivera also noted that the sliding door of the van was open at this time. After intervention, the agents observed that two suitcases lay in plain view in the vehicle. These facts all suggest more than a random connection between the vehicle and the suspected narcotics trafficking and in light of the circumstances were sufficient to warrant the officers in believing that the vehicle contained contraband. We accordingly find that the search of the van was supported by probable cause.

### D. The red Mazda Protege

■ Vélez maintains that the search of the red Mazda Protege was unlawful. We disagree. Two U.S.D.A. stickers were in plain view near the dashboard, thus linking the vehicle to the suspected narcotics trafficking and warranting the Agents' belief that it contained contraband. We accordingly find that the search of the red Mazda Protege was supported by probable cause.

### E. The gray Cougar and the black Lumina

■ Rodríguez–Rodríguez maintains that the search of the gray Cougar was invalid. We disagree. The Passenger's handling of the suspicious packages occurred between the gray Cougar and the white GMC van. Moreover, the Agents observed that two U.S.D.A. stickers lay in plain view in the Cougar. In light of the circumstances, we think that these observations were sufficient to warrant the officers in believing that the vehicle was being used to transport narcotics to the airport. We accordingly find that the search of the gray Cougar was supported by probable cause.

■ Rodríguez–Rodríguez also challenges the search of the black Lumina. While this presents a somewhat closer call, we think the search was supported by the requisite probable cause. Admittedly, Rodrí-

---

11. Before searching the vehicles, the police identified their owners by questioning the defendants and running computer checks on the license plates.

guez–Rodríguez arrived in the black Lumina after the Pathfinder had left the area. He joined the group for only a few minutes, left in the black Lumina, and returned shortly thereafter. The Agents did not observe anything being placed in or withdrawn from the vehicle.

Nevertheless, before searching the vehicles, the Agents determined that Rodríguez–Rodríguez owned the gray Cougar,[12] in which the Agents had observed U.S.D.A. stickers. This was sufficient to warrant the Agents' belief that Rodríguez–Rodríguez was intimately involved in the suspected narcotics trafficking. Thus, before searching the black Lumina, the Agents reasonably suspected Rodríguez–Rodríguez of drug trafficking and knew that he was independently associated with two vehicles at the scene of the arrest: the one in which he arrived and the one he owned. These facts, in conjunction with Agent Rivera's previous observations and the cash and tickets already seized, were sufficient to warrant the Agents' belief that the black Lumina was being used to transport narcotics. *See McCoy,* 977 F.2d at 711 (where officers have probable cause to believe that the suspects used the vehicle in criminal activity, they may reasonably infer the vehicle contains contraband). We accordingly find that the search of the black Lumina was supported by probable cause.

## MOTIONS TO WITHDRAW GUILTY PLEAS

Rodríguez–Resto, Vélez, and Travieso all contend that the district court erred in denying their motions to withdraw their guilty pleas.

■ Other than for errors of law, we will overturn the trial judge's decision to deny a motion to withdraw a guilty plea only for "demonstrable abuse of discretion." *United States v. Allard,* 926 F.2d 1237, 1245 (1st Cir.1991) (citing *United States v. Pellerito,* 878 F.2d 1535, 1538 (1st Cir.1989)). The trial court's subsidiary findings of fact in connec-

tion with the plea-withdrawal motion are reviewed only for clear error. *Id.*

■ It is well settled that a defendant may withdraw a guilty plea prior to sentencing only upon a showing of "fair and just reason" for the request. *United States v. Cotal–Crespo,* 47 F.3d 1, 3 (1st Cir.1995) (citing *Pellerito,* 878 F.2d at 1537); *see also* Fed.R.Crim.P. 32(d). To gauge whether the asserted ground for withdrawal meets the Rule 32(d) standard, a court must look at the totality of the circumstances, especially whether the defendant's plea was knowing, voluntary, and intelligent within the meaning of Rule 11. *See Cotal–Crespo,* 47 F.3d at 3–4; *United States v. Doyle,* 981 F.2d 591, 594 (1st Cir.1992); *Pellerito,* 878 F.2d at 1537. Other factors the court may consider include (1) the plausibility of the reasons prompting the requested change of plea; (2) the timing of the defendant's motion; and (3) the existence or nonexistence of an assertion of innocence. *Cotal–Crespo,* 47 F.3d at 3–4. Lastly, even where a defendant appears to meet the strictures of this four-part test, the court still must evaluate the proposed plea withdrawal in relation to any demonstrable prejudice that will accrue to the government if the defendant is permitted to change his plea. *United States v. Parrilla–Tirado,* 22 F.3d 368, 371 (1st Cir.1994) (citing *Doyle,* 981 F.2d at 594; *Pellerito,* 878 F.2d at 1537).

■ All three appellants contend that their codefendants and attorneys coerced them into accepting the package plea agreement at joint meetings immediately prior to the plea hearings. It is beyond dispute that a guilty plea is involuntary and therefore invalid if it is obtained "by actual or threatened physical harm or by coercion overbearing the will of the defendant." *Brady v. United States,* 397 U.S. 742, 750, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747 (1970). The Supreme Court has also explained that "a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person *other* than the accused might pose a greater danger of inducing a false guilty plea by skewing the risks a defendant must consid-

---

**12.** The black Lumina was owned by the sister of appellant Pagán. It is not clear from the record when the Agents learned this.

er." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n. 8, 98 S.Ct. 663, 669 n. 8, 54 L.Ed.2d 604 (1978) (dictum). This concern applies to package plea agreements because, "[q]uite possibly, one defendant will be happier with the package deal than his codefendant(s); looking out for his own best interests, the lucky one may try to force his codefendant(s) into going along with the deal." *United States v. Caro*, 997 F.2d 657, 659–60 (9th Cir.1993). Package plea deals therefore impose special obligations: the prosecutor must alert the district court to the fact that codefendants are entering a package deal, Fed. R.Crim.P. 11(e)(2); *United States v. Daniels*, 821 F.2d 76, 78–79 (1st Cir.1987); *see also Caro*, 997 F.2d at 659–60, and the district court must carefully ascertain the voluntariness of each defendant's plea. *See United States v. Buckley*, 847 F.2d 991, 1000 n. 6 (1st Cir.1988), *cert. denied*, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989); *Daniels*, 821 F.2d at 79–80; *see also Caro*, 997 F.2d at 660.

Here, it is clear from the record that the district court was fully aware of the package nature of the defendants' plea agreements. We nevertheless must determine whether the district court conducted a proper voluntariness inquiry, or otherwise erred in concluding that none of the three appellants had asserted a "fair and just reason" for withdrawing his plea.

### A. *Rodríguez–Resto*

▮ Before ruling on his motion to change his plea, the district court heard testimony from Rodríguez–Resto, his attorney, and Martínez' attorney. Rodríguez–Resto testified, in effect, that his attorney would not let him plead not guilty because it would have destroyed the package deal negotiated for all of the defendants. Both attorneys testified that Rodríguez–Resto's guilty plea was entirely voluntary and was in no way coerced by the threat of nullifying the package deal. In fact, they testified, they were concerned about the voluntariness of package plea agreements and consulted with Assis-

tant United States Attorney Pereira, who stated: "Look, if your client wants to go to trial, there are three defendants that will go to trial anyway. So he can go to trial and the agreement will stand for the rest of the defendants." Both attorneys testified that when Rodríguez–Resto was informed that he could go to trial without jeopardizing the package agreement, he again reiterated his desire to plead guilty.

After hearing this testimony, the district court denied Rodríguez–Resto's motion to withdraw, stating that his testimony simply was not credible. The district court found that his guilty plea had been entered voluntarily and that his claim of coercion merely reflected second thoughts about the wisdom of his decision after learning that two codefendants had been acquitted at trial. These findings are amply supported by the record and therefore do not constitute clear error. Moreover, we note that at the original plea hearing, the district court specifically asked Rodríguez–Resto whether anyone had forced him to plead guilty, to which he responded no. Such statements in open court during a plea hearing "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977). Accordingly, we hold that the district court properly denied Rodríguez–Resto's motion to withdraw his guilty plea.

### B. *Vélez and Travieso*

▮ Both Vélez and Travieso maintain that they were coerced into accepting the package plea agreement. We need not reach the issue of whether their pleas were in fact coerced because we find that the district court failed to conduct a full and direct voluntariness examination in open court, thereby compromising one of Rule 11's "core concerns" and undermining the validity of their guilty pleas.[13] *See Allard*, 926 F.2d at 1244–45 (explaining that Rule 11's core concerns are 1) absence of coercion, 2) understanding of the charges, and 3) knowledge of the consequences of the guilty plea).

---

13. The district court divided the ten appellants into two groups of five for the purpose of conducting their plea colloquies. Rodríguez–Resto was in the first group, and Vélez and Travieso were in the second. Thus, Vélez and Travieso were not asked exactly the same questions that Rodríguez–Resto was asked.

Rule 11(d) states: "The court shall not accept a plea of guilty or nolo contendere without first, *by addressing the defendant personally in open court,* determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement." Fed.R.Crim.Proc. 11(d) (emphasis added). Here, the district court conducted only a partial inquiry into the voluntariness of Travieso's and Vélez' guilty pleas. Specifically, it asked them whether they had "entered into [the] plea agreement without compulsion or any threats or promises by the—from the U.S. Attorney or any of its agents." It did not, however, ask whether the defendants were pleading guilty voluntarily or whether they had been threatened or pressured by their codefendants into accepting the package plea agreement. Under these circumstances, the district court's inquiry was incomplete because, regardless of whether Travieso's and Vélez' guilty pleas were actually coerced by their codefendants, the literal answer to the court's question could still have been "yes." Admittedly, all the defendants acknowledged in their written plea agreements that they had not been threatened or pressured into entering their guilty pleas, and all testified at the plea hearings that they had answered the questions in the plea agreements truthfully after consultation with their attorneys. In many situations, however, "reliance on 'a written document is not a sufficient substitute for personal examination [by the court].'" *United States v. Medina–Silverio,* 30 F.3d 1, 3 (1st Cir.1994) (quoting James W. Moore, 8 *Moore's Federal Practice* ¶ 11.–05[2] (1994)) (other citations omitted). The Supreme Court has similarly expressed the importance of direct interrogation by the district court judge in determining whether to accept the defendant's guilty plea:

> To the extent that the district judge thus exposes the defendant's state of mind on the record through personal interrogation, he not only facilitates his own determination of a guilty plea's voluntariness, but he also facilitates that determination in any subsequent post-conviction proceeding based upon a claim that the plea was involuntary. Both of these goals are undermined in proportion to the degree the district judge resorts to "assumptions" not based upon recorded responses to his inquiries.

*McCarthy v. United States,* 394 U.S. 459, 467, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969).

Where a district court has only partially addressed one of Rule 11's core concerns, we must reverse a determination that there was no fair and just reason to set the plea aside unless the irregularities in the plea proceeding do not affect "substantial rights" of the defendant. *See Cotal–Crespo,* 47 F.3d at 7 (discussing application of Rule 11(h)'s harmless error standard when plea-taking errors result in a "partial failure" to address one of Rule 11's core concerns). Because package-type plea agreements increase the risk that one defendant will coerce another to plead guilty, the district court was obligated to ascertain carefully whether the defendants were in fact entering their pleas without compulsion. *See Daniels,* 821 F.2d at 79–80; *United States v. Buckley,* 847 F.2d at 1000 n. 6. Here, the district court made no effort whatsoever to determine whether Travieso's and Vélez' pleas were coerced. Under these circumstances, we cannot say that they lacked a fair and just reason for plea withdrawal, especially since the court's lapse arguably affected their substantial rights. The advisory committee's notes make clear that Rule 11(h) "was not intended to allow district courts to ignore Rule 11['s] express commands." *Medina–Silverio,* 30 F.3d at 4 (citation omitted). Rather, Rule 11(h)'s harmless error provision is intended to excuse "minor and technical violation[s]" and cannot be invoked where the court's deviation effectively "nullif[ies] important Rule 11 safeguards." Fed.R.Crim.Proc. 11(h) advisory committee's note to 1983 amendment. Vélez' and Travieso's guilty pleas must therefore be set aside and the case must be remanded for further Rule 11 proceedings or trial.

## INEFFECTIVE ASSISTANCE OF COUNSEL

On the morning of the suppression hearing, Pagán's attorney moved for a continu-

ance because her presence was required at another hearing. The court denied the motion, noting that a continuation would be logistically implausible because of the large number of defendants, attorneys, and witnesses present for the hearing. After consulting with Pagán, his attorney asked Travieso's attorney to cover for her during the suppression hearing. Pagán's attorney returned shortly after the court had begun ruling on the motions to suppress. After denying the motions, the court agreed to allow the defendants to file motions to reconsider and to provide Pagán's counsel with a transcript of the hearing. Although the court later extended the deadline for filing motions, Pagán never sought reconsideration.

Pagán now contends that the court erred by denying his motion for a continuance, and that as a result of this error, he was denied effective assistance of counsel. We need not wax longiloquent on this contention. *United States v. Talladino,* 38 F.3d 1255, 1261 (1st Cir.1994). Initially, we note that Pagán points to nothing in the record that would suggest that the district court abused its discretion in denying the continuance. *See United States v. Rodríguez–Cortés,* 949 F.2d 532, 545 (1st Cir.1991) (refusal to grant a continuance is reviewed for abuse of discretion, and only "unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" constitutes an abuse of discretion). Moreover, Pagán's ineffective-assistance-of-counsel claim is utterly untenable given the extensive cross-examination conducted by the defense counsel for his eleven codefendants. Additionally, we note that even after receiving the transcripts of the hearing, Pagán's counsel did not move for reconsideration, suggesting that she was then satisfied with the record developed by the other attorneys. In fact, Pagán still has not explained what additional questions his counsel would have asked Agent Rivera at the suppression hearing. We accordingly reject Pagán's ineffective-assistance-of-counsel claim.[14]

14. Although we ordinarily refrain from entertaining ineffective-assistance-of-counsel claims on direct review, *see United States v. Mala,* 7 F.3d 1058, 1063 (1st Cir.1993), we have elected to

We have explored the other claims raised by the appellants and find them equally meritless.

*Affirmed in part, reversed in part.*

reach Pagán's claim because the record is sufficiently well developed to permit adjudication and the claim is bound up in the claim for denial of a continuance—a claim that is properly before us.