# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 18, 2003 Session

## JOSEPH LANCE RISNER v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Greene County
### No. 01CR155    James E. Beckner, Judge

### No. E2002-01112-CCA-R3-PC
### June 30, 2003

The Appellant, Joseph Lance Risner, appeals from the dismissal of his petition for post-conviction relief. Pursuant to a "package deal" plea, Risner, along with five of his co-defendants, pled guilty to three counts of first degree murder, one count of attempted murder, two counts of especially aggravated kidnapping, two counts of kidnapping, and one count of class D felony theft. On appeal, Risner presents the following issues for our review: (1) whether his plea was knowingly and voluntarily entered; (2) whether he was denied the effective assistance of counsel; and (3) whether the indictment, which did not include the aggravating circumstances qualifying him for the death penalty violates *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and is, thus, unconstitutional. Finding no reversible error, we affirm the judgment of the Greene County Criminal Court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.

DAVID G. HAYES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Richard L. Gaines, Knoxville, Tennessee, for the Appellant, Joseph Lance Risner.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Eric Christensen, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

On August 6, 1997, Vidar Lillelid, his wife, Delphina, and their six-year-old daughter, Tabitha, were murdered near an interstate rest stop in Greene County. Two-year-old Peter Lillelid suffered two life-threatening gunshot wounds, one of which caused the loss of an eye. The Appellant

and his five co-defendants, Karen Howell, Natasha Cornett, Crystal Strugill, Jason Bryant, and Dean Mullins, were indicted for three counts of first degree murder, one count of attempted first degree murder, two counts of especially aggravated kidnapping, two counts of aggravated kidnaping, and one count of theft of property valued over $1,000. On February 18, 1998, five days prior to trial, the State made a "package deal" plea offer. The offer required all the defendants, including Howell and Bryant, who were minors at the time of the offenses, to plead guilty to all charges before the State would agree to remove the death penalty from consideration for the adult defendants. The offer also required all of the defendants to accept the offer within two days. On February 20, 1998, the Appellant and his co-defendants appeared before the trial court as a group and pled guilty to the offenses as charged. The plea agreement provided that the sentences for the murder and attempted murder convictions would be determined by the trial court. At the conclusion of the sentencing hearing, the trial court sentenced each of the defendants to life in prison without the possibility of parole for each of the first degree murder convictions and twenty-five years for the attempted murder conviction. All of these sentences were ordered to be served consecutively. Pursuant to the terms of the plea agreement, the trial court imposed concurrent sentences of twenty-five years for each of the two counts of especially aggravated kidnapping, twelve years for each of the two counts of aggravated kidnapping, and four years for theft. The Appellant's sentences were affirmed on direct appeal. *See generally State v. Karen Howell, et. al*, 34 S.W.3d 484 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 2000).

The Appellant subsequently filed a petition for post-conviction relief, and a hearing was held on February 21, 2002. The following facts, relevant to the circumstances surrounding the Appellant's plea, were developed at the hearing. On February 18, 2000, the same day the State extended the plea offer, trial counsel, Mark Slagle, met with the Appellant to inform him of the terms of the offer. Slagle explained to the Appellant that in exchange for the guilty pleas, the State would withdraw the death penalty notices for the adult defendants and recommend effective sentences of twenty-five years for the lesser charges. The trial court would determine the sentences for the murder and attempted murder charges. The Appellant was advised of the possible sentences for the murder charges. According to the Appellant, Slagle stated to him, "this is pretty much the best that we [are] going to get." Slagle testified that he advised the Appellant to accept the deal in order to avoid the death penalty. The Appellant responded that he "didn't like it, and [he] didn't think it was right . . . because . . . [he] didn't kill anyone." Slagle then left in order to discuss the offer with the co-defendants' attorneys. After he left, the Appellant telephoned his mother, who had already been informed of the offer by the Appellant's attorneys. His mother was crying and encouraged him to accept the offer. He then spoke with his step-father, Ray Risner, who also advised the Appellant to take the offer but stated that it was the Appellant's decision.

Slagle again returned to visit the Appellant and informed him that everyone had accepted the offer except for Karen Howell, the Appellant's girlfriend. The Appellant did not understand why Howell, a juvenile, would accept the deal because she had nothing to gain from doing so. According to the Appellant, Slagle, more aggressively, advised him that the deal was the best he was going to get and he should accept the deal to save himself "from the electric chair." The Appellant claimed that Slagle said, if he didn't accept the offer, then all of his co-defendants would receive the death

penalty. Slagle testified that he was only concerned for the Appellant's life. The offer was discussed further, and the meeting ended with the Appellant stating, "I really don't like it, would you let me know what Karen does."

Slagle returned for a third meeting. At this time, Slagle informed the Appellant that Howell had accepted the offer, leaving him as the "last man." Slagle testified that the Appellant was "shocked" that she had accepted the offer. The Appellant stated, "I had all their voices, . . . telling me basically by signing this thing, telling me that they wanted to live." The Appellant testified that Slagle again informed him that "this was the only way [he] was going to live, . . . this is the best we're going to get." The Appellant also said that he was affected by his own guilt, and he felt "bad for the things that happened[.]" The Appellant still tried to "fight off" accepting the offer. He claimed that Slagle stated, "I don't know how you think you're going to live with yourself if you let little Crystal Strugill die in the electric chair." According to the Appellant, Slagle appeared more aggravated than before. After further discussion, the Appellant decided to accept the offer.

On February 20, 1998, Slagle, along with co-counsel, Woody Smith, returned for a fourth and final meeting with the Appellant. They reviewed the offer, and the Appellant signed the plea agreement and waiver of rights forms. Smith had also prepared a ten-paragraph memorandum for the Appellant to sign, which included the following:

> 3. I understand that Judge Beckner, rather than a jury, will conduct a sentencing hearing, and will then sentence me on the three (3) counts of murder and one (1) count of attempted murder.
>
> 4. I understand that this plea bargain agreement includes the removal of the possibility of my receiving the death penalty. Judge Beckner would sentence me to life in prison with parole or life in prison without parole. There is no agreement with the State concerning the three (3) counts of murder and the one (1) count of attempted murder to which I will plead guilty, except that the State will no longer seek the death penalty.
>
> 5. I have been advised by my attorneys that, in their opinion, Judge Beckner will likely sentence me to life without parole, or, if he gives me the opportunity of parole, will likely run the murder count sentences consecutively (stack them on top of each other) so that the net effect would be the same, natural life in prison. . . .
>
> 7. I have discussed this matter with my mother, my step-father, and my former step-father. I have discussed it in detail with my attorneys. I have considered it over two (2) full days since I have been advised of the offer.
>
> 8. I have reached my decision without pressure or force or threats used against me. I have agreed with the State's plea bargain offer of my own free will, after giving the matter much thought. Part of the reason for my decision is for the protection of my

friends, Dean Mullins and Crystal Sturgill. Part of the reason for my decision to accept the plea bargain offer is for the protection of my own life. . . .

10. My attorneys have answered all of my questions, and I have a full understanding of the nature of the charges against me, of possible defenses, of the State's evidence to be used against me, of my constitutional rights in this case, including the evidence and witnesses that I could bring forward, and I have considered all of these matters in reaching my decision to accept the State's plea bargain offer.

Each paragraph was initialed by the Appellant and the entire document was signed. The Appellant testified that he was reluctant to initial paragraph five. According to the Appellant, he initialed this paragraph after Slagle informed him that paragraph five was just a formality and would not influence the judge's decision. Slagle testified that he told the Appellant that this was his professional opinion of the likely sentence. Slagle and the Appellant went on to discuss the guilty plea procedures and the questions which would be asked of the Appellant at the plea hearing. The Appellant testified that Slagle told him to lie in response to the question, "Are you pleading guilty because you are in fact guilty?" Slagle denied the allegation. That evening, the Appellant and his co-defendants went before the trial court and entered guilty pleas.

The Appellant also testified that he would not have pled guilty absent pressure from his attorneys, and he did so in order to save the lives of his co-defendants. He stated that he respected the opinions of his attorneys during the time they were encouraging him to accept the plea offer. Furthermore, the Appellant testified that, during his eleven and a half months in jail prior to the plea discussions and proceedings, he was placed in a "suicide cell," which kept him isolated from other inmates. The only persons he had contact with were his family members and attorneys. As the trial date approached, the Appellant became more stressed. A week and half before trial, a nurse at the jail prescribed Xanax for him, and he took the drug daily until the day he entered his plea. He stated that the medication lowered his stress level but "muddied things up a little bit." After the conclusion of the post-conviction hearing, the Appellant's petition was denied, and this appeal followed.

**ANALYSIS**

**I. Voluntary Plea**

The Appellant alleges that his plea was involuntarily entered because (1) the "package deal" plea or contingent plea offer was coercive, and (2) the group plea colloquy was improper. In order to succeed on a post-conviction claim, the Appellant bears the burden of showing by clear and convincing evidence, the allegations set forth in his petition. Tenn. Code Ann. § 40-30-210(f) (1997).

To satisfy constitutional standards of due process, a guilty plea must be entered knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 1712 (1969). In order for a plea to be deemed knowingly and voluntarily entered, an accused must be informed

of the rights and circumstances involved and nevertheless choose to waive or relinquish those rights. *State v. Mackey*, 553 S.W.2d 337, 340 (Tenn. 1977); *see also* Tenn. R. Crim. P. 11. *Boykin* requires the intentional relinquishment or abandonment of the accused's right against self-incrimination, the right to confront one's accusers, and the right to a trial by jury. *Id.* In evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court held, "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 164 (1970). In making this determination, the reviewing court must look to the totality of the circumstances. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990), *perm. to appeal denied*, (Tenn. 1991). Indeed, a

> court charged with determining whether . . . pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). A plea cannot be voluntary if the accused is "'incompetent or otherwise not in control of his mental facilities.'" *Id.* (quoting *Brown v. Perini*, 718 F.2d 7884, 788 (6th Cir. 1983)).

## A. "Package Deal" Plea

The Appellant urges this court to adopt *In re Ibarra*, 666 P.2d 980 (Cal. 1983), which requires a court to consider, in addition to the totality of the circumstances surrounding the plea, five specific factors when reviewing a "package deal" plea. However, there is Tennessee case law directly on point. Contingent plea offers have been approved as an acceptable plea bargaining method. *See Parham v. State*, 885 S.W.2d 375, 382 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1994); *State v. Street*, 768 S.W.2d 703, 711 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1988); *Hodges v. State*, 491 S.W.2d 624, 627-28 (Tenn. Crim. App. 1972). In Tennessee, a reviewing court, determining the voluntariness of a "package deal" plea, must employ a totality of the circumstances approach and, while several of the *Ibarra* factors may be relevant in this determination, specific consideration of these five factors is not required.

The following principles are inherent within this State's acceptance of contingent plea agreements. There is no constitutional right of an accused to plea bargain, and there is no duty of the State to engage in plea negotiations. 22 C.J.S. *Criminal Law* § 366 (1989) (citing *Weatherford v. Bursey*, 429 U.S. 545, 561, 97 S. Ct. 837, 846 (1976); *United States v. Pleasant*, 730 F.2d 657, 665, (11th Cir.), *cert. denied*, 469 U.S. 869, 105 S. Ct. 216 (1984)). The State, as well as the persons accused, is entitled to have its rights protected and, when several persons are charged jointly with

a single crime, the State is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants. *Woodruff v. State*, 51 S.W.2d 843, 845 (Tenn. 1932).

Concerning the totality of the circumstances accompanying the Appellant's plea, the Appellant contends that his plea was involuntarily based upon:

(1) The package deal agreement in this case required all co-defendants to sign on, when two (2) of the co-defendants were juveniles and could not receive any more serious sentence on the first degree murder counts than what they received as part of this deal. . . . The fact that the juveniles were included in this agreement . . . did have an effect on [the Appellant's] plea. . . . The last of his resolve to resist accepting this agreement crumbled when he was told Karen Howell[, a juvenile,] had accepted the plea, in part, to save his life;

(2) [The Appellant] testified repeatedly that he was close to most of the co-defendants (except for Jason Bryant) and had known them for years. . . . Faced with the prospect of being the last holdout and, thereby, possibly causing the deaths of the other adult co-defendants, [the Appellant] could do nothing but accept the agreement. . . . There was no more substantial factor in [the Appellant's] plea than the promises of leniency to the co-defendants in this case;

(3) [The Appellant] had been on what he termed "suicide watch" in isolation at the Greene County Jail for almost a year. His only visitors were his family, his lawyers, and jail guards. [He] had little to no contact with anyone else throughout the course of his jail stay;

(4) . . . [D]uring the course of much of these plea negotiations and discussions with his counsel, he was under the effect of the prescription medication Xanax. Although [the Appellant] does not testify that this had a strong effect upon his thinking, he did state that he became "more muddled" and this certainly had impact on his will to resist pressures;

(5) . . . [T]here were only two full days after the plea offer was made to come to a decision; and

(6) [The Appellant] was twenty-one (21) years [old] when this occurred and had no previous experience with the criminal justice system.

After review of the Appellant's petition and the testimony at the post-conviction hearing, the post-conviction court found the Appellant's plea to be voluntary and explained its reasoning as follows:

From all of the evidence it is clear that the petitioner would have plead guilty without what he describes as undue pressure from his attorneys. He did not want to die.

It is equally clear that petitioner did not plead guilty just to save the lives of co-defendants.

The petitioner, being very intelligent, paid a great deal of attention to what was going on in the case.

He was reluctant to take the plea but was not coerced. To petitioner's credit he debated all the issues fully in order to satisfy himself that it was the right thing to do but, once he concluded it was the right thing, he never questioned it thereafter.

Over two weeks expired between the plea of guilty and the sentencing hearing and petitioner never asked to withdraw the plea nor expressed any reservations about it.

This in spite of the fact that his attorneys had told him that in their opinion petitioner would serve the rest of his natural life in prison, either by consecutive life sentences or a life without parole sentence.

The transcript of the plea allocution clearly shows that the plea was individualized as to the petitioner even though he chose to plead at the same time as the co-defendants.

At the time the plea was entered on February 20, 1998, the petitioner was drug free. He had had no medication for over twenty four (24) hours.

He says he thought the plea was just a "formality" but the record belies that assertion.

Petitioner answered all questions appropriately and assured the court that he understood all his rights, the elements of the offenses, the possible punishments and the consequences of pleading guilty. He assured the Court that he was satisfied with the representation of him by his attorneys and that he was pleading guilty because he was guilty. . . .

He asked the court to accept his plea understanding everything in the allocution.

There was never anything to cause petitioner's attorneys to believe that he was not competent. They would never have allowed him to plead guilty if they thought he did not understand what he was doing.

In this instance, the record demonstrates that the Appellant was literate, educated, articulate, and intelligent. The State had sufficient evidence to convict the Appellant, and his guilty pleas were based upon the advice of competent attorneys. The Appellant's attorneys both testified that they believed the Appellant knew the consequences of his plea when he entered it. The Appellant and his attorneys had lengthy and thorough discussions concerning the terms of the offer, and the memorandum signed by the Appellant indicates that he fully understood the consequences of his pleas. Trial counsel testified that there was no evidence that the Appellant's reasoning abilities were affected by the Xanax. Furthermore, the Appellant testified that he was not under the effects of Xanax at the time he entered his pleas. The record indicates that the Appellant accepted the offer primarily due to his overwhelming desire to avoid the death penalty. That he had a similar desire to allow his co-defendants to do the same is a legitimate reason to accept a plea agreement and suggests the plea was voluntary and based upon an understanding of its consequences. *Edward Dean Mullins v. State*, No. E2002-00730-CCA-R3-PC (Tenn. Crim. App. at Knoxville, Feb. 24, 2003), *perm. to appeal denied*, (Tenn. 2003); *see also Crystal Rena Strugill v. State*, No. E2002-00385-CCA-R3-PC (Tenn. Crim. App. at Knoxville, Feb. 4, 2003), *perm. to appeal filed*, (Tenn. April 4, 2003); *Natasha W. Cornett v. State*, No. E2002-00034-CCA-R3-PC (Tenn. Crim. App. at Knoxville, Sept. 30, 2002), *perm. to appeal denied*, (Tenn. 2003). The fact that the plea offer included juveniles does not render the Appellant's plea involuntary. Moreover, the Appellant made no attempt to withdraw his guilty plea during the two weeks that ensued between the plea and sentencing hearings.

Under the facts of this case, the Appellant faced a significant likelihood of the death penalty. The decision to plead guilty is heavily influenced by a defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. *Brady v. United States*, 397 U.S. 742, 756, 90 S. Ct. 1463, 1473 (1970). A guilty plea motivated by a desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law is not invalid under the Fifth Amendment. *Id.* at 751, 1470. Accordingly, we conclude that the plea bargaining process in this instance was not fundamentally unfair.

## B. Group Plea Colloquy

In addition, the Appellant argues the trial court failed to elicit responses from the Appellant sufficient to establish that the Appellant's pleas of guilty were knowing and voluntary. Specifically, he contends that,

[b]ecause of the nature of the package deal plea agreement here, as well as the coerciveness apparent [in this type of plea] . . . , the trial court accepting the plea was bound to make further inquiry to determine, "any unduly coercive forces that might render such an involuntary plea." . . . This extra inquiry should have taken place at

the time the plea was made by the co-defendants. Particularized questions and answers to each individual should have been made to each co-defendant.

The nature and extent of the colloquy between the trial court and the defendant, which must appear on the face of the transcript, is unclear. *Moten v. State*, 935 S.W.2d 416, 420 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1996) (citing *Chamberlain*, 815 S.W.2d at 540). However, "the record must reflect both the advice litany by the trial court and some affirmative indication that the defendant understood his rights and the ramifications of his guilty plea thereon." *Id.* (quoting *James Lucious Goodrum v. State*, No. 1196 (Tenn. Crim. App. at Knoxville, July 30, 1991), *perm. to appeal denied*, (Tenn. 1992); *Glenn Beeler v. State*, No. 01C01-9010-CR-00265 (Tenn. Crim. App. at Nashville, Sept. 6, 1991) (Tipton, J., concurring)). In other words, the advice litany alone is insufficient. In *State v. Neal*, 810 S.W.2d 131, 137-38 (Tenn. 1991), the Tennessee Supreme Court, addressing the simultaneous entry of guilty pleas by multiple defendants, stated that:

> It is substantial compliance if the entire litany of rights and other required explanatory information is communicated in open court . . . in the presence of their respective attorneys, so long as the number involved is not so great as to make individual understanding unlikely; and provided that each defendant is addressed individually to establish on the record the understanding and agreement of each defendant.

*See also State v. McClintock*, 732 S.W.2d 268, 273 (Tenn. 1987) (every court is required to make adequate personal inquiry of defendants to assure the validity of all necessary waivers; the taking of criminal pleas cannot be reduced to a rote administrative proceeding). Furthermore, it has been held that the existence of a "package deal" plea imposes a special obligation on the trial court to carefully ascertain the voluntariness of each defendant's plea. 21 Am. Jur. 2d *Criminal Law* § 690 (1998) (citing *United States v. Martinez-Molina, et al.*, 64 F.3d 719, 733 (1st Cir. 1995)). However, it has also been held that the trial court does not have to undertake a special voluntariness inquiry when faced with a package deal plea, and that a thorough but standard inquiry into a defendant's plea is sufficiently probing of the voluntariness of the "package deal" plea. *Id.* (citing *United States v. Holland*, 117 F.3d 589, 594 (D.C. Cir. 1997); *State v. Danh*, 516 N.W.2d 539, 542 (Minn. 1994)).

In this case, the transcript of the guilty plea hearing indicates that the trial court questioned the Appellant and his five co-defendants as a group and received group responses, which are depicted in the transcript of the hearing as, "All defendants answered affirmatively" or "All defendants answered negatively." The court only deviated from this procedure once. Individual answers were only given in response to the following question, "Are you all pleading guilty because you are guilty?"

In *Boykin*, the Supreme Court stated the following:

> What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to

make sure he has a full understanding of what the plea connotes and of its consequence. When the judge discharges that function, he leaves a record adequate for any review that may be later sought . . . and forestalls the spin-off of collateral proceedings that seek to probe murky memories.

*Boykin*, 395 U.S. 243-44, 89 S. Ct. at 1712-13.  The trial court did not receive individual, identified responses to each question.  *Boykin*'s concern for probing "murky memories" applies to this case.  *Glenn Beeler*, No. 01C01-9010-CR-00265 (Tipton, J., concurring).  "Rare is the day that we . . . can discern, verify or subsequently review a record which is based upon a nodding mass of defendants or upon a chorus of answers." *Id*.  Accordingly, we conclude that the guilty plea hearing in this case did not meet the requirements of *Neal* and *Boykin*.

Having concluded that the guilty plea hearing was *Boykin*-deficient, our final inquiry is whether that error is harmless beyond a reasonable doubt.  *Neal*, 810 S.W.2d at 138 (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824 (1967)).  We conclude that the record supports the testimony that the petitioner knowingly and voluntarily waived his rights guaranteed under *Boykin*.  As previously noted, the record demonstrates that the Appellant was literate, educated, articulate, and intelligent.  The post-conviction court noted that the Appellant "paid a great deal of attention to what was going on in the case. . . . [H]e debated all the issues fully in order to satisfy himself that it was the right thing to do but, once he concluded it was the right thing, he never questioned it thereafter."  During all stages of these proceedings, the Appellant was represented by competent counsel who were experienced in capital defense.  The Appellant's attorneys both testified that they believed the Appellant knew the consequences of his plea when he entered it.  Trial counsel discussed with the Appellant his rights and the plea dialogue.  Furthermore, the Appellant signed a memorandum stating that he was aware of his constitutional rights.  Therefore, we hold that his pleas of guilty were voluntarily and intelligently entered and that any *Boykin* deficiency was harmless beyond a reasonable doubt.

## II. Ineffective Assistance

Second, the Appellant contends that he was denied effective assistance of counsel because trial counsel failed to challenge, and even encouraged acceptance of, the "package deal" plea.  Specifically, the Appellant contends that trial counsel

did no research regarding package deals and plea agreements; they filed no written objections to this type of plea offer; they filed no motions to withdraw the plea; they conducted no legal research after the plea was made, but before the appeal was taken; they did not raise this issue in the appellate courts on direct appeal; and they never asked for further inquiry by the court to determine whether this plea was voluntary and freely made by [the Appellant].

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea.  In this respect, such claims of ineffective assistance

necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. *Hill v. Lockhart*, 474 U.S. 52, 56, 106 S. Ct. 366, 369 (1985) (citing *North Carolina v. Alford*, 400 U.S. at 31, 91 S. Ct. at 164)).

To succeed in a challenge for ineffective assistance of counsel, the Appellant must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), the Appellant must establish (1) deficient representation and (2) prejudice resulting from the deficiency. In the context of a guilty plea, to satisfy the second prong of *Strickland*, the Appellant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. at 59, 106 S. Ct. at 370; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

Because we have previously determined that no reversible error occurred from the circumstances surrounding the Appellant's guilty plea, trial counsel was not ineffective for failing to challenge the "package deal" plea or the group colloquy. Moreover, we observe that trial counsel testified that he thoroughly reviewed all aspects of the case with the Appellant on numerous occasions throughout the course of his representation. The post-conviction court obviously credited the testimony of trial counsel that he did not overreach or place undue influence upon the Appellant in order to get him to plead guilty. Because we do not revisit the issue of credibility on appeal, we defer to the post-conviction court's ruling in that regard. *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). We conclude that the record fully supports the finding of the post-conviction court that the Appellant has not proven by clear and convincing evidence that he received ineffective assistance of counsel. This issue is meritless.

### III. Failure of Indictment to Allege Capital Offense

Finally, the Appellant argues, pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), the indictments are unconstitutional and his life sentences without the possibility of parole are invalid because the aggravating circumstances, relied upon by the State in seeking the death penalty, were not charged in the indictment. We note that a guilty plea conviction is based entirely upon the plea, and the plea constitutes a conviction in and of itself and is conclusive. *Beaty v. Neil*, 467 S.W.2d 844, 847 (Tenn. Crim. App. 1971). As a general rule, an accused who enters a plea of guilty to a criminal offense waives the right to appeal. *Hobbs v. State*, 73 S.W.3d 155, 158 (Tenn. Crim. App. 2001), *perm. to appeal denied*, (Tenn. 2002). The Appellant's appeal does not fall within any exception. *See* Tenn. R. Crim. P. 37(b); Tenn. R. App. P. 3(b)(2). A plea of guilty, which is entered voluntarily, knowingly, and intelligently, waives all prior non-jurisdictional, procedural, and constitutional defects in the proceedings. *State v. McKissack*, 917 S.W.2d 714, 716 (Tenn. Crim. App. 1995). As discussed above, there is nothing in the record to support a conclusion that the pleas were not voluntarily and knowingly entered. The constitutional issue presented was waived by the Appellant's pleas of guilty.

Regardless of waiver, the issue of whether the *Apprendi* holding is applicable to Tennessee's capital sentencing procedure has recently been addressed in *State v. Dellinger*, 79 S.W.3d 458, 466-67 (Tenn.), *cert. denied*, 123 S. Ct. 695 (2002), *State v. Richard Odom*, No. W2000-02301-CCA-R3-DD (Tenn. Crim. App. at Jackson, Oct. 15, 2002), *appeal docketed*, No. W2000-02301-SC-DDT-DD (Tenn. 2002); and *State v. Gdongalay P. Berry*, No. M2001-02023-CCA-R3-DD (Tenn. Crim. App. at Nashville, Apr. 10, 2003), *appeal docketed*, No. M2001-02023-SC-DDT-DD (Tenn. 2003), and found to be meritless.

In *Apprendi*, the United States Supreme Court struck down a New Jersey hate crime statute, which permitted the judge to enhance the defendant's sentence above the maximum range if the crime was racially motivated. *Apprendi*, 530 U.S. at 496-97, 120 S. Ct. at 2366. The Court held that:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions of [*Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215 (1999)]: "It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt."

*Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63 (quoting *Jones*, 526 U.S. at 252-53) (footnote omitted). The Tennessee Supreme Court, in *Dellinger*, 79 S.W.3d at 466-67, explained why *Apprendi* is not applicable to a capital case in Tennessee:

> 1. . . . The *Apprendi* holding applies to enhancement factors other than prior convictions. . . .
>
> 2. The death penalty is within the statutory range of punishment prescribed by the legislature for first degree murder. Tenn. Code Ann. § 39-13-202(c)(1) (Supp. 2002). The *Apprendi* holding applies only to enhancement factors used to impose a sentence above the statutory maximum. *Apprendi*, 530 U.S. at 481, 120 S. Ct. at 2348. . . .
>
> 3. District attorneys in Tennessee are required to notify capital defendants no less than thirty days before trial of the intent to seek the death penalty and must specify the aggravating circumstances upon which the State intends to rely during sentencing. Tenn. R. Crim. P. 12.3(b). Rule 12.3(b) therefore satisfies the requirements of due process and notice. . . .
>
> 4. Tennessee's capital sentencing procedure requires that a jury make findings regarding the statutory aggravating circumstances. Tenn. Code Ann. § 39-13-204(f)(1), (I) (Supp. 2002). The *Apprendi* holding applies only to sentencing

procedures under which judges sentence the defendants. *Apprendi*, 530 U.S. at 476, 120 S. Ct. at 2348.

5. Tennessee's capital sentencing procedure requires that the jury find any statutory aggravating circumstance beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(f)(1), (I). The Tennessee statutes therefore comply with the "beyond a reasonable doubt" standard required by *Apprendi*. *Apprendi*, 530 U.S. at 476, 120 S. Ct. at 2348.

*Dellinger*, 79 S.W. 3d at 466-67. In accordance with *Dellinger*, we conclude that the principles of *Apprendi* do not apply to Tennessee's capital sentencing procedure. "Neither the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." *Id.* at 467.

## CONCLUSION

Finding no reversible error, we affirm the dismissal of the Appellant's petition for post-conviction relief.

                           _____

                           DAVID G. HAYES, JUDGE